STATE of Minnesota, Respondent,

v.

Richard Alan MOORMAN, Appellant.

No. C7–91–2470.

Supreme Court of Minnesota.

Sept. 17, 1993.

JoAnne M. Yanish, Asst. State Public Defender, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Lee W. Barry, Sr. Asst. County Atty., Minneapolis, for respondent.

GARDEBRING, Justice.

This case arises out of appellant's conviction for first-degree murder in the death of fourteen-year-old Jamie Cooksey. In September 1990, Cooksey was raped and then strangled to death on her way to school through Brookdale Park. Appellant was arrested about a month later on an unrelated charge for criminal sexual assault and eventually confessed to the Cooksey homicide. We affirm his conviction.

■ Appellant makes several arguments on appeal. First, he alleges that because his arrest was made without probable cause, his confession and certain other evidence should be suppressed. Second, he contends that a statement given without a *Miranda* warning fatally tainted any subsequent confession. Third, he complains that the trial court's evidentiary rulings and instructions to the jury denied him a fair trial. Finally, he argues that the trial court relied on the wrong statute when it sentenced him and that his sentence, even under the applicable statute, is unconstitutional.[1]

On the morning of September 14, 1990, Jamie Cooksey set off on her bicycle to meet friends on the way to school. After receiving word from school authorities that Jamie had not been in class, both parents left work to look for her. Her father eventually found her body in Brookdale Park beneath some trees. The autopsy showed that Jamie had suffocated due to ligature strangulation; a cord, twisted by a stick, was found deeply embedded in her neck. The autopsy also indicated that she had been sexually assaulted.

On the night of October 15, 1990, appellant was walking a sixteen year-old female acquaintance to her boyfriend's house. On the way, appellant began to make unwanted advances toward the girl and steered her into Hamilton Park. Shortly after midnight, two men near the park heard the girl's screams. An officer arrived at the park within minutes of the call placed by one of the men. As the officer shone a light under some trees, he saw appellant attempting to cover the victim with his arm as she cried for help. As they came out from under the tree, the officer heard appellant say to the girl: "Shush, shush. Don't say anything." As soon as the two separated, the officer saw the girl run away from appellant and begin screaming. Before speaking to the victim, the officer handcuffed appellant, informing him he was doing so for safety reasons. When the officer's backup arrived at the scene a short time later, the girl ran up to the backup officer, grabbed him and would not let go.

After getting information from his backup, the officer informed appellant that he was under arrest for criminal sexual conduct and assault. This occurred at approximately 12:30 p.m. on October 16. Later, a pair of numchucks were found under the tree where appellant had attempted to hide. When they arrived at the Brooklyn Park jail, the officer was informed that there was an existing war-

1. Appellant also argues that his statements should be suppressed because the length of time between his arrest and his appearance before a judge violated the Minnesota Rules of Criminal Procedure. We decline to consider this issue because it was not raised below. We have said that "[w]e do not 'decide issues which are not first addressed by the trial court and are raised for the first time on appeal even if the issues involve constitutional questions regarding criminal procedure.'" *State v. Roby*, 463 N.W.2d 506, 508 (Minn.1990) (quoting *State v. Sorenson*, 441 N.W.2d 455, 457 (Minn.1989)).

rant for appellant's arrest issued by the Department of Corrections for a parole violation on a conviction for criminal sexual conduct.

Detective Nordan, a member of the sex crimes unit of the Brooklyn Park Police Department, interviewed appellant on the afternoon of October 16. He believed the assault of the previous evening bore a strong resemblance to the Cooksey murder. On the way to the interview room and before appellant was given a *Miranda* warning, Nordan asked him if he was familiar with Pyramid cigarettes, a generic brand, and then offered him one. Appellant said that he was familiar with that brand and accepted the cigarette.[2] Appellant was then given a *Miranda* warning and agreed to talk until he felt that he needed a lawyer. Roughly thirty minutes into the interview, appellant gave a formal statement about the previous night's assault.

The following evening, October 17, at around 8:00 p.m., both Detective Nordan and Special Agent Doolittle of the Bureau of Criminal Apprehension ("BCA"), the Cooksey task force coordinator, interviewed appellant about the Cooksey murder. After again receiving his *Miranda* rights, appellant agreed to talk to the two detectives until he believed he needed counsel. After about an hour, Agent Doolittle asked Detective Nordan to leave the room. At that time, Agent Doolittle described the evidence which he said indicated that appellant had committed the Cooksey murder: Pyramid cigarettes were found at the murder scene; a blood sample taken from the victim matched his blood; a blue ten speed bike similar in color to his bike was seen by a witness near the scene around the time of the crime; and the cord found around the victim's neck was similar to a cord off a jacket from Burger King, appellant's place of employment.[3] Doolittle then asked if appellant killed Jamie Cooksey. Appellant denied any involvement in the murder. Doolittle and appellant talked alone for about an hour. After that,

Doolittle told appellant that Detective Nordan would return and talk with him about the Hamilton Park incident of the night before.

Nordan returned about 10 p.m. to continue the interview with appellant alone. Appellant brought up the Cooksey murder and mentioned that there seemed to be a lot of evidence implicating him. The interview resumed and appellant discussed the Hamilton Park assault and his prior record. Then appellant turned the conversation back to the Cooksey murder. Eventually, after Nordan implied that appellant's confession would somehow restore Cooksey's lost honor, appellant confessed, but he refused to put the confession on tape. Appellant's confession took place about forty-six hours after he was arrested. After appellant confessed to the crime in detail, Detective Malmquist was called in to listen and appellant repeated his confession to Malmquist. However, appellant still refused to give a tape recorded formal statement.

■ We first examine whether the officer who initially responded to the Hamilton Park assault had probable cause to arrest appellant. In *State v. Olson*, 436 N.W.2d 92 (Minn.1989), *aff'd*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the court stated the test for probable cause:

> [W]hether the officers in the particular circumstances, conditioned by their own observations and information and guided by the whole of their police experience, reasonably could have believed that a crime had been committed by the person to be arrested.

*Id.* at 94 (citing *State v. Merrill*, 274 N.W.2d 99, 108 (Minn.1978)). Whether the arresting officer's actions were reasonable is an objective inquiry; it does not depend on the officer's subjective frame of mind at the time of the arrest. *State v. Speak*, 339 N.W.2d 741, 745 (Minn.1983). The existence of probable cause depends on the facts of each individual

---

**2.** Nordan admitted at the Rasmussen hearing that he asked appellant this question because a Pyramid cigarette butt was found at the scene of the Cooksey murder.

**3.** It is important to note that, at the time of this interview, no blood had been taken from appel-

lant in connection with the Cooksey homicide, the BCA had ruled out the possibility that the cord used to strangle Cooksey came from a Burger King jacket and appellant's admission that he was familiar with Pyramid cigarettes was unwarned.

case. *State v. Cox,* 294 Minn. 252, 256, 200 N.W.2d 305, 308 (1972). We have also held that whether the police had probable cause to arrest is a decision that affects constitutional rights, and as such, an appellate court "makes an independent review of the facts to determine the reasonableness of the police officer's actions." *Olson,* 436 N.W.2d at 94.

■ The arresting officer received a radio call from a private citizen who heard a woman scream and the sound of a body being dragged through the grass in Hamilton Park shortly past midnight. When the officer arrived at the scene, appellant and the victim were lying underneath a tree. The officer heard the girl crying for help and heard appellant tell her to keep quiet. After telling the two to come out from underneath the tree, the officer saw the girl run off screaming. The officer then handcuffed appellant, led him to the squad car and searched him.

It is clear in this case that appellant was under arrest as soon as he was handcuffed. *State v. Lohnes,* 344 N.W.2d 605, 610 (Minn. 1984). Appellant argues that although the officer may have had probable cause to arrest after consulting with the other officer at the scene (who spoke to the victim), the arresting officer did not have probable cause at the time appellant was handcuffed. He asserts that the situation at the time of the arrest appeared ambiguous and only rose to mere suspicion, not enough to constitute probable cause.

We believe that given the information he had, the time the incident took place and the cries of victim, the arresting officer could have reasonably concluded that an assault had taken place or was about to take place, even before conferring with the backup officer.

■ Appellant further argues that the arrest was pretextual, that it was just a means to interrogate appellant for the Cooksey murder. This argument has no merit. There is no indication that the arresting officer knew that appellant was a former sex offender or that he made any connection between the assault and the Cooksey murder. The officer did not learn of the appellant's outstanding warrant from the Depart-

ment of Corrections until he returned to the police station.

In short, we find that the arrest was made with probable cause and was not pretextual. Therefore, the arrest provides no basis upon which to suppress appellant's confession or the numchucks found at the scene.

Appellant next argues that his confession should have been suppressed because his earlier unwarned admission that he was familiar with Pyramid cigarettes fatally tainted his confession, and thus his rights under the fifth amendment of the United States Constitution, and art. I, § 7 of the Minnesota Constitution were violated. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The controlling federal case in this circumstance is *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In *Elstad,* when the defendant was asked what he knew about a burglary before he was given the *Miranda* warning, he admitted that he had been present at the time of the burglary. Later, after receiving his warning, the defendant confessed to the burglary. Defendant then moved for the confession to be suppressed as the fruit of the poisonous tree under *Wong Sun* and its progeny. The Court held:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293. The Court went on to state:

> Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the *second statement* was

also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.

*Id.* at 318, 105 S.Ct. at 1297–1298 (emphasis added).

█ There is no doubt that appellant's unwarned admission regarding his knowledge of Pyramid cigarettes was voluntarily made. The real question is whether, in light of his previous unwarned statement, his later confession was also voluntary. To make this determination, the court must look at the totality of the circumstances. *Id.; State v. Slowinski,* 450 N.W.2d 107, 111 (Minn.1990).

Under a totality of the circumstances test, the court must undertake a "subjective, factual inquiry" into events and conditions surrounding the confession: *Id.* at 111. In *State v. Linder,* 268 N.W.2d 734 (Minn.1978), we listed the factors to be considered when making this inquiry. They include the age, maturity, intelligence, education and experience of the defendant as well as his or her ability to comprehend, the lack of or adequacy of the warnings, the length and legality of the detention, the nature of the interrogation, and physical deprivations and limits on counsel and friends. *Id.* at 735.

█ First, we note that appellant had prior experience in the criminal justice system and is of sufficient intelligence and age to understand the situation in which he found himself. Second, neither the nature nor the length of the interrogation, was unreasonable or burdensome.

Next, although appellant argues that he is a diabetic and was not given anything to eat during the five hour interview in which he confessed, the record shows that appellant did not ask for anything to eat, nor did his physical appearance change in the interview. If appellant did suffer physical deprivation, the police were totally unaware of it and did not use it to coerce an involuntary confession. Examining the facts of this case in light of the *Linder* factors, we do not believe appellant's confession was made involuntarily.

Appellant next argues that Agent Doolittle lied to him about the evidence that existed against him in the Cooksey murder, rendering his confession involuntary. Agent Doolittle of the BCA told appellant that certain evidence linked him to the Cooksey murder, when, in fact, it did not. Appellant relies on *State v. Garner,* 294 N.W.2d 725 ((Minn. 1980), in which the court held that where the interrogating officer intentionally lied[4] to the defendant, put stress on him by threatening to charge him with as many crimes as possible and physically intimidated him, the confession should have been suppressed. Additionally, the defendant in *Garner* was intoxicated at the time of his confession.

We believe that *Garner* is easily distinguished because of the additional misconduct that occurred in that case not present here: threats and physical intimidation. Although the false information may have had some effect on appellant, we believe these tactics do not rise to the level of misconduct exhibited in *Garner.* Under neither of appellant's theories was the confession involuntarily made; therefore, its admission was proper.

█ We next examine whether the trial court erred when it admitted evidence of appellant's past bad acts. Ordinarily, evidence of other crimes or prior bad acts of a defendant are not admissible to show behavior consistent with the character of that defendant as suggested by those acts. *State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965); *State v. DeWald,* 464 N.W.2d 500 (Minn.1991). An exception to that rule is found in Minn.R.Evid. 404(b):

Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In a criminal prosecution, such evidence shall not be admitted

4. It should be noted that the U.S. Supreme Court has refused to hold a confession involuntary where a defendant confessed after he was falsely told that his codefendant had turned State's evidence. *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969).

unless the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence.

This evidence of prior bad acts and previously committed crimes is commonly known as *Spreigl* evidence.

Appellant complains of four *Spreigl* incidents that were admitted by the trial court. The first occurred in June 1987, when appellant forced a fifteen-year old girl to have sexual intercourse with him in the back of a car. When she resisted he threatened to choke her. The victim identified appellant in a lineup.

The second offense took place two months later in August 1987. The victim, a seventeen-year-old girl was sexually assaulted by appellant. Forensic tests showed that the semen of the attacker was consistent with that of appellant. Additionally, as with the Hamilton Park assault, numchucks were found at the scene.

The third *Spreigl* incident occurred in July 1990 when a twenty-year old woman was assaulted under a bridge by two men, one of whom raped her. When the rapist finished, he strangled her into unconsciousness with a bandanna. This victim positively identified appellant in a photo lineup.

The last *Spreigl* incident occurred early in the morning of October 16, 1990 in Hamilton Park, when appellant was arrested for attempted criminal sexual conduct. The state offered these incidents as relevant based on their similarity in time, place and *modus operandi*.

In *State v. Matteson*, 287 N.W.2d 408, 410–11 (Minn.1979), the court listed six requirements that must be met to allow admission of *Spreigl* evidence: 1) the state must give notice that it intends to use such evidence; 2) at the time the evidence is offered, the state must specify the exception to the general exclusionary rule under which it is admissible; 3) there must be some nexus in time, location or *modus operandi* between the crime charged and the evidence; 4) the evidence is only admissible if the trial court finds that the evidence of the defendant's identity is weak; 5) the evidence of past

crimes or acts must be clear and convincing; and 6) the trial court must instruct the jury that the evidence is admitted for a limited purpose, to show identity. Appellant disputes that the third and fifth factors articulated in *Matteson* were established; he makes no argument as to the other factors. Further, he argues that the probative value of the evidence was outweighed by its prejudicial effect. *State v. DeWald*, 464 N.W.2d at 503; *State v. Slowinski*, 450 N.W.2d at 114.

 The decision to admit *Spreigl* evidence lies within the discretion of the trial court and will be allowed to stand absent an abuse of discretion. *DeWald*, 464 N.W.2d at 503. The accused has the burden of showing that the trial court erred in admitting the evidence. *State v. Loebach*, 310 N.W.2d 58, 64 (Minn.1981). We believe appellant failed to meet his burden. Appellant asserts that the *modus operandi* of the *Spreigl* incidents neither corroborated the charged offense, nor was similar enough to be admitted as evidence of common scheme. On the contrary, the *Spreigl* incidents were similar in time, place and *modus operandi*.

All four *Spreigl* incidents occurred within just over three years. Appellant was incarcerated for over two of the three years these incidents took place. This fact weighs in favor of admission. In *State v. Filippi*, 335 N.W.2d 739, 743–44 (Minn.1983), we held that a four and a half-year lag between a *Spreigl* offense and the charged offense did nothing to lessen the relevancy of the prior offenses because a good deal of that time the defendant was in prison.

All four *Spreigl* incidents occurred in either Anoka County or Hennepin County. All the victims were assaulted in grassy, remote areas, and strangulation was threatened or carried out. In two of the incidents, numchucks were found. In all of the incidents, the victims were hit or slapped. The *Spreigl* incidents meet the "nexus" prong of the *Matteson* factors.

 Next, appellant argues that his participation in the *Spreigl* incidents was not proved by clear and convincing evidence. We disagree. The victim in the first *Spreigl* episode picked him out of a police lineup and

positively identified appellant at the trial in this matter. We have previously held that eyewitness identification helps to meet the clear and convincing evidence standard. *State v. Jones,* 392 N.W.2d 224, 234 (Minn. 1986). The county attorney dropped the charge in exchange for appellant's guilty plea in the second *Spreigl* incident. This plea is sufficient by itself to meet the clear and convincing standard for the second *Spreigl* offense. *Holmes v. State,* 394 N.W.2d 818, 822 (Minn.App.1986). In the third incident, the victim picked appellant out of a photo lineup as her attacker, except that the victim believed his hair color was different. Appellant testified at the trial in this case that at the time this incident occurred his hair was dyed a different color. Semen, consistent with that of appellant, was found on the victim, and when appellant was interviewed regarding this incident, he admitted that he could have been the attacker. Also, in response to hearing that the victim was still devastated by the attack, appellant told the police that she could rest at ease. Appellant was never charged with this assault. Finally, as to the last *Spreigl,* appellant's identity is not in doubt. The victim testified that he was trying to kiss her, he put her on the ground and told her that if she did not cooperate that he would kill her. This testimony satisfies the state's burden of production. All the *Spreigl* incidents were proven by clear and convincing evidence.

 Finally, appellant argues that the *Spreigl* evidence was improperly admitted because its prejudicial effect outweighed its probative value. *Spreigl* evidence is allowed at trial when the state's case is weak.[5] Although the risk of prejudice is present whenever *Spreigl* evidence is admitted, in "weighing the probative value against the prejudicial effect, the trial court must consider the

extent to which the *Spreigl* evidence is crucial to the state's case." *DeWald,* 464 N.W.2d at 504. In the instant case, there were no eyewitnesses to the murder and no direct evidence linking appellant to the crime aside from the Pyramid cigarette butt. Further, this court has held that where identity is at issue and the defendant offers an alibi, as he did in this case, the state may buttress its case with *Spreigl* evidence. *State v. Billstrom,* 276 Minn. 174, 178, 149 N.W.2d 281, 284 (1967). Consequently, the trial court had adequate grounds upon which to base its decision that the admission of the *Spreigl* evidence was necessary to support the state's burden of proof and that its probative weight was greater than its prejudicial effect. We conclude that the *Spreigl* evidence was properly admitted.

Appellant complains that the trial court erred in admitting certain pieces of evidence. We examine each contention separately.

(1) Appellant's writings

 A passage written by appellant depicting a scene of coerced sex was admitted at trial. The parties stipulated that the writing was appellant's. Although the writing was of limited probative value, its prejudicial effect would have undoubtedly outweighed its value. Consequently, under Minn.R.Evid. 403, it should not have been admitted. However, it appears that counsel did not object to the admission of the evidence. Therefore, appellant has waived his right to have the issue considered on appeal. *State v. Smith,* 299 N.W.2d 504 (Minn.1980).

(2) Photographs of victims

 Appellant objects to the admission of two sets of photographs, the first showing Cooksey's body after the homicide and the second showing one of the appel-

---

5. The trial court conducted a Rasmussen hearing in March 1991 which dealt with various motions made by the defense. Included in these motions was appellant's motion to exclude his prior bad acts as *Spreigl* evidence. At the hearing, the trial court concluded that, absent appellant's disputed confession, the state's case rested on weak circumstantial evidence. The weakness of the state's case clearly militates in favor of admission when the court weighs the probative value against the prejudicial effect of the evidence.

*State v. DeWald,* 464 N.W.2d 500, 503–04 (Minn. 1991). In this case, it appears that the state's case was so weak that the *Spreigl* evidence was "necessary to support the state's burden of proof." *State v. Billstrom,* 276 Minn. 174, 178, 149 N.W.2d 281, 284 (1967). However, the final determination of the strength of the state's case should be made by the trial court after the state has presented all of its non-*Spreigl* evidence. *DeWald,* 464 N.W.2d at 504. The record does not reveal any such assessment in this case.

lant's victims in a *Spreigl* incident after the assault. The admission of photos lies within the discretion of the trial court. *State v. Daniels,* 361 N.W.2d 819, 828 (Minn.1985). The rule on the admission of photos was set forth in *State v. DeZeler,* 230 Minn. 39, 46–47, 41 N.W.2d 313, 319 (1950):

> Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description * * * provided they are relevant to some material issue; and they are not rendered inadmissible merely because they vividly bring to jurors the details of a shocking crime or incidentally tend to arouse passion or prejudice.

(Emphasis in the original).

At trial, the state's expert testified that the photos would aid her in explaining the injuries to the jury. The consistency of the injuries between Cooksey and the *Spreigl* victim also helps demonstrate a common *modus operandi.* Although the photos were unpleasant to view, we believe the photos were properly admitted.

(3) State witness' testimony

 A witness for the prosecution testified that a man she saw in the park around the time of the Cooksey murder was "rough looking," and "untrustworthy," and that he looked like "he had been around the block, so to speak, several times." She further testified that when she saw the man, she had a feeling that he had just relieved himself or that he had raped someone. Finally, she testified on cross examination that she guessed the man's age to be in his 40s or 50s at the time she talked to the police.

Appellant asserts that her testimony was irrelevant and prejudicial. On the contrary, her testimony was very relevant because, at the approximate time of the murder, she saw a man come through the grass and get on a blue bike that fit the description of appellant's bike. She also testified to the clothes he wore. If there was any prejudice from this testimony it should be regarded as harmless error, especially in light of the wit-

ness' admission that she thought the man she saw was in his 40s or 50s, and appellant is 24.

(4) Discharge from military

 Evidence was disclosed at trial surrounding appellant's discharge from the military. The state concedes that this evidence should not have been admitted by the trial court. Nevertheless, it appears to be harmless error in light of the other evidence available to the jury.

(5) Videotape narrated by Cooksey's father

 The trial court allowed the jury to see a videotape of Cooksey's father showing detectives his route through the park where he found his daughter's body. The transcript of the video is cumulative, but does not constitute inflammatory testimony.

(6) Evidence of prior convictions

 The trial court allowed evidence of bad acts through *Spreigl* testimony. However, it first allowed evidence of appellant's prior conviction for criminal sexual assault to impeach appellant. The admission of a prior conviction for impeachment purposes is controlled by Minn.R.Evid. 609(a), which states:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment.

*State v. Jones,* 271 N.W.2d 534, 538 (Minn. 1978), sets forth the five factors a court should consider in determining whether the probative value of the prior conviction outweighs its prejudicial effect:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting

use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

Appellant's main objections relate to the impeachment value of the previous assault and the similarity of the prior crime. The trial court held that the prior conviction has impeachment value because it allowed the jury to make a determination of appellant's credibility. This holding is supported by established precedent:

> [Rule 609] clearly sanctions the use of felonies which are not directly related to truth or falsity for purposes of impeachment, and thus necessarily recognizes that a prior conviction, though not specifically involving veracity, is nevertheless proba-tive of credibility.

*State v. Brouillette,* 286 N.W.2d 702, 708 (Minn.1979).

■ At first blush, the problem of the similarity of the prior conviction with the charged crime appears more difficult. However, we have vested the trial courts with great discretion to make determinations under Rule 609. *See e.g., State v. Frank,* 364 N.W.2d 398 (Minn.1985) (prior sexual assault convictions properly admitted for impeachment purposes in trial for first-degree criminal sexual conduct); *State v. Lloyd,* 345 N.W.2d 240 (Minn.1984) (trial court properly made decision to admit second degree murder conviction for impeachment purposes in trial for first degree murder had defendant testified). Moreover, in this case, appellant was probably not hurt by the introduction of his prior conviction because appellant nonetheless took the stand to deny his confession and because the assault upon which his conviction was based eventually came in as *Spreigl* evidence.

■ Appellant next urges that the jury instructions given by the trial court denied him due process of law. The jury instructions in relevant part are as follows:

> [I]f you are persuaded to a moral certainty of the guilt, then it is your duty to bring in

a guilty verdict. If not, it is your duty to bring in a not guilty verdict. * * *

By abiding conviction or a moral certainty, we mean a conviction that remains with you, not one you have for a moment and discard the next moment, but one which remains and stays with you. In other words, you ought to have that degree of certainty and decisiveness in this case, and all like it, which you would like to have before you would act readily in your most important affairs of life. In matters which may be of the highest importance to yourself.

Appellant claims this instruction diluted the concept of reasonable doubt to a degree that deprived him of due process. He further asserts that even though no objection was made at the time the instruction was given, the instruction amounted to plain error which negatively affected his rights to a fair trial and that as a result, review by this court is necessary.

The basis for this argument is found in *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam), where the Supreme Court struck down an instruction that equated reasonable doubt with "grave uncertainty" and an "actual substantial doubt." *Id.* at 40, 111 S.Ct. at 329. The instruction also stated that "[w]hat is required [to convict] is not an absolute or mathematical certainty, but a moral certainty." *Id.* The Court then held:

> It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. *When those statements are then considered with the reference to "moral certainty,"* rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Id.* at 41, 111 S.Ct. at 329–330 (emphasis added).[6]

---

**6.** Since *Cage* the Supreme Court has clarified its standard of review for jury instructions. In *Estelle v. McGuire,* —— U.S. ——, ——, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991), the Court

rejected standards requiring consideration of what a reasonable juror "could" or "would" have done and held that it will inquire "whether there is a reasonable likelihood that the jury has

In this case, the trial court did not attempt to equate "reasonable doubt" with the more stringent standard of "substantial" or "grave" doubt. The instruction given by the trial court equated moral certainty with the degree of certainty that is desirable before making one of the most important decisions of one's life. If anything, it appears that the trial court's instruction in this case required a higher burden of proof from the state than is required.[7] The problems with the instruction in *Cage* involved the requirements that the jury have "a grave uncertainty" with regard to doubt if it intended to acquit and "a moral certainty" with regard to guilt if it intended to convict. It is the first requirement that created a higher standard for the jury to find reasonable doubt and acquit and rendered the instruction unconstitutional. That standard is not present in the instruction in this case.

Finally, appellant argues that he was sentenced under an inapplicable statute, that the trial court's findings are inadequate for the sentence received and that Minn.Stat. § 609.-184 violates the eighth amendment of the federal Constitution.

■ Appellant was indicted under Minn. Stat. §§ 609.185 and 609.184. However, at the sentencing hearing, the trial court said he was being sentenced under Minn.Stat. §§ 609.185 and 609.196. Nevertheless, it is clear that the trial court sentenced appellant under the correct statutes, but simply misstated them at the sentencing hearing. Minn.Stat. § 609.196 refers to a person who has been convicted under Minn.Stat. § 609.19 [murder in the second degree] or § 609.195 [murder in the third degree]. Appellant was sentenced to life without parole. This is only possible under Minn.Stat. § 609.184.

■ Next, appellant asserts that the trial court made inadequate findings as to whether appellant had one or more convictions for a "heinous crime." The trial court said:

Pursuant to the entire record in this case, the Court finds that your sexual assault fits the requirement for the enhancement, and that the sentence is applicable in your case.

Appellant was previously convicted of a violation of Minn.Stat. § 609.342, first degree criminal sexual conduct. This offense qualifies as a "heinous crime" as defined in Minn. Stat. § 609.184 if it was committed with force. Although the trial court did not explicitly find that appellant's previous crime was carried out "with force," it is clear from the record that the rape in that case involved force. Also, though the court did not specify which "sexual assault" allowed for the enhancement under Minn.Stat. § 609.184, the court could only have meant the prior conviction.

■ Appellant also asserts that the punishment of life without parole is disproportionate to the crime at bar, particularly because the mandatory nature of § 609.184 deprives the sentencer from taking into account mitigating factors in sentencing. Appellant wishes this court to extend the standards relating to capital punishment to situations where criminals are incarcerated without the possibility of parole. Appellant argues that to refuse to do so violates the eighth amendment of the Federal Constitution. However, appellant cites no case law in support of his proposition.

■ Appellant also argues that the terms "force" and "violence" are not defined sufficiently so that § 609.184 is constitutionally vague. However, the term "force" is defined in Minn.Stat. § 609.341. Further, under Minn.Stat. § 645.16 "violence" should be given its plain meaning.

---

applied the instruction in a way that violates the Constitution." (*citing Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)). The court did not, however, call the result in *Cage* into question. *Estelle,* —— U.S. at ——, n. 4, 112 S.Ct. at 482 n. 4.

7. The trial court defined "moral certainty" as the degree of certainty "you would like before you would act readily in your most important affairs of life, in matters which may be of the highest importance to yourself." This largely comports with the definition of reasonable doubt found in 10 Minn.Dist. Judges Ass'n, *Minnesota Practice* CRIMJIG 3.03 (3d ed. 1990): "Proof beyond a reasonable doubt is such proof as ordinarily prudent men and women would act upon in their most important affairs."

Finally, appellant argues that whether his prior crimes were committed with "force" or "violence" should have been answered by the jury. This issue was not before the trial court and therefore is not ripe for appeal. *State v. Robinson*, 480 N.W.2d 644, 646 (Minn.1992).

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.