STATE of Minnesota, Respondent,

v.

Adrian Dominic RILEY, Appellant.

No. C8–96–1394.

Supreme Court of Minnesota.

July 31, 1997.

**520**

Joseph Margulies, David Connor, Law Student, Minneapolis, for Appellant.

Hubert H. Humphrey, III, Attorney General, Catherine M. Kearne, Assistant Attorney General, St. Paul, Michael A. Fahey, Carver County Attorney, Chaska, for Respondent.

## OPINION

BLATZ, Justice.

Appellant Adrian Dominic Riley was convicted on three counts of first-degree murder and three counts of second-degree murder arising from the shooting deaths of Troy Tholkes, James M. Walters, and Treesa Woods in Watertown Township, Minnesota, on May 23, 1995. The trial court sentenced Riley to three consecutive life sentences on the first-degree murder convictions. On appeal to this court, Riley raises five issues: 1) whether his warrantless arrest was supported by probable cause; 2) whether the "fruits" of his arrest ought to have been suppressed; 3) whether his statement to the police should have been suppressed as the product of "trickery and deceit"; 4) whether a ballistics expert ought to have been permitted to state his opinion to a "reasonable degree of scientific certainty"; and 5) whether Riley ought to have been permitted to introduce evidence that he was willing to take a polygraph test. We affirm.

The case against Riley was substantially circumstantial. Because of the nature of the issues raised on this appeal, a detailed account of the events preceding and following the murders is necessary.

At about 10 p.m., Monday, May 22, 1995, the night before the murders, two of the victims, Walters and Tholkes, took Tholkes' 1989 blue Beretta to a cash machine to get money for drugs. Several hours later, at about 3 a.m., Tuesday, May 23, 1995, Walters and Tholkes were gathered with Riley, a crack dealer, in the home of Cheryl Hamre, Cheri Tholkes' next-door neighbor (Tholkes' sister). At that time, Sherri Murphy, a tenant in the Hamre home, was awakened by voices and the slamming of a door. When she went downstairs to find out what was going on, she noticed that four men were present: Riley, who is black, along with three white men, Walters, Tholkes, and Dave Buda. Before returning to bed, Murphy told Walters that his girlfriend, Woods, had called for him.

Later that morning, at about 8:45 a.m., James Greenwood, who lived at 3155 Navajo, in Watertown Township, dressed for work. Before departing, he checked his answering machine and noticed Tholkes, an acquaintance, lying on the couch, and an unidentified black man on the floor under a blanket. Greenwood also smelled a burning substance he believed to be crack cocaine emanating from the room of his housemate, Walters. Outside, Greenwood saw Tholkes' Beretta with a primer colored bumper.

In the mid-morning, Leon Fritzke, an employee of the City of Watertown, was patching streets when he encountered one white man and one black man in a car. The black man, who was the driver, asked Fritzke where he could buy ammunition. Fritzke directed them to a gunsmith in town. Sometime between 10 a.m. and noon, a white man and a black man entered the All Seasons Sports store in Delano and asked for 9 mm shells. The clerk told the two men that the store did not have 9 mm shells in stock.

At noon, Walters called Woods' house and left her a message. At 12:19 p.m., a call was placed from the 3155 Navajo home to a hos-

pital room at Hennepin County Medical Center occupied by Riley's mother. A previous call from the 3155 Navajo home had been made to the hospital room earlier that morning.

Later that afternoon, a man working near 3155 Navajo heard shots being fired. The witness heard the gunshots sometime between 2:30 and 3:30 p.m.

Between 4:45 and 5 p.m., while driving her son to golf lessons, Jan Ryan encountered a black man in a car at the intersection of Willow and Watertown Road, in Orono, Minnesota. The man asked for directions to Minneapolis. Soon after, Michael McCall also spotted a black man in a blue Beretta in Orono, Minnesota. McCall testified that the man asked for directions to Highway 12 because he wanted to get back to Minneapolis. McCall noticed that paint was missing from the bumper of the blue Beretta the man was driving.

That evening, at about 11 p.m., Riley and a man called Jojo arrived at the front door of Benjamin Bobo's residence at 2610 13th Avenue South, Minneapolis. One of the two men, Bobo could not remember who, gave Bobo a 9 mm pistol which Bobo placed under his bed. Jojo left at about 12:30 a.m., but Riley stayed all night.

Meanwhile, back in Watertown Township, Greenwood arrived home at 3155 Navajo. It was about 11:45 p.m. Tuesday. Greenwood noticed that Tholkes' Beretta was not in the driveway. When Greenwood walked upstairs to go to bed, he stopped at Walters' bedroom door which was wide open. He saw Woods, Walters' girlfriend, lying face down and yelled her name. When she failed to respond, he pressed his foot against her back thigh and found her body to be very stiff. He knew she was dead and noticed a little blood by her head. Greenwood then turned and ran out of the house.

Once in his car, Greenwood called 911 from his cellular phone and drove to the Red Roof Inn in Plymouth. Meanwhile, dispatchers put out the call directing the police to go to 3155 Navajo. After arriving at the scene, the police found the bodies of Walters and Tholkes outside the house and the body of

Woods in an upstairs bedroom. Autopsies later confirmed that all three victims had been shot to death.

Outside, near the bodies of Walters and Tholkes, the police found a tree with targets on and around it. The tree and the target were riddled with bullet-sized holes. Nearby, the police collected 9 mm shell casings which they believed had been recently discharged. A deputy coroner retrieved an address book from the back pocket of Tholkes' pants and gave it to the police. On the first page of the address book was a handwritten entry for "Dre," Riley's nickname, followed by a phone number. Inside, the police came upon a box for a Smith & Wesson 9 mm handgun on the floor of the bedroom where the police discovered Woods' body. The box had been opened and the gun was missing. The police advised police dispatch to list the gun as stolen. Later, the police learned that the missing gun had been purchased by Walters from his brother.

In the morning of Wednesday, May 24, 1995, BCA Agent Eugene Leatherman and Carver County Sheriff Detective Paul Schnell spoke with Greenwood at the Plymouth Police Department. During the interview, Greenwood's fingerprints were taken, his blood was drawn, and his hands were tested for gunshot residue.

After speaking to Greenwood, investigators concluded that at least four people had been alive at 3155 Navajo the previous Tuesday morning—Greenwood, Walters, Tholkes, and an unidentified black man. Greenwood had been interrogated. Walters and Tholkes were dead. The only other person who had been seen at the Navajo house before the murders and who remained unaccounted for was the unidentified black man.

On Wednesday morning, while Murphy was sleeping, Riley called Murphy and left her three or four messages. Murphy had purchased crack cocaine from Riley on a number of previous occasions. At about noon, Murphy was awakened by Cheri Tholkes. Cheri Tholkes was screaming that Tholkes was dead and that the police officers wanted all pager numbers that Murphy had.

Murphy never returned Riley's messages, but when Riley called Murphy again at about 12:45 p.m., Wednesday, she spoke with him. During that conversation, Riley inquired about $50 that Murphy owed him. Murphy told Riley that she would have the money that weekend, and Riley assured Murphy that he would not give her any trouble over $50. Riley also stated that he wanted Murphy to get him some marijuana.

At about 2 p.m., Murphy spoke with police officers, including Agent Leatherman, and told them she had seen Dre and the others in the kitchen in the early morning hours on Tuesday, May 23rd. Murphy, who later learned that Dre and Riley were the same person, gave the police Dre's pager number. Murphy then paged him three times at the request of the police. When Riley returned the calls, Murphy told him that she wanted to deliver some marijuana to him.

When Riley returned the first page at 4:28 p.m., he said he was in St. Paul. However, a police trace on the call revealed it originated from Bobo's home in Minneapolis. When Riley returned the second page at 5:32 p.m., he said he was in south Minneapolis. A trace on that call showed it was made from 2606 Bloomington Avenue, Minneapolis. Murphy paged Riley a third time, and when Riley called back, she tried to get him to agree to meet in south Minneapolis. Riley refused and did not return Murphy's subsequent pages.

Meanwhile, sometime during the mid-afternoon on Wednesday, May 24th, while Riley was at Bobo's home, Bobo retrieved the gun from underneath his bed. Riley told Bobo details about the gun and ammunition and pulled out the gun's magazine.

At 7 p.m., the Emergency Response Unit, the Minneapolis SWAT team, was called to Bobo's and approximately 40–45 members of the team surrounded the house. About a half hour later, Bobo and his son went outside to empty the trash and were met by the police with guns drawn. The officers lowered their guns once they recognized Bobo, who told the police that Riley was inside.

At 10:30 p.m., the police obtained a search warrant that authorized a search of the Bobo residence and Riley's arrest. The search warrant was supported by information the police knew prior to, as well as information gathered after, employing the Emergency Response Unit. On appeal, the parties conceded that at about the same time as the search warrant was obtained, Fritzke, the City of Watertown employee, talked with the police and told them he had been approached by two men in a car on Tuesday, May 23rd, who were in search of ammunition.

At about 12:30 a.m., Thursday, May 25th, after the police attempted to communicate with Riley but failed to get him to leave the house, the police bombed the residence with tear gas. The police let the tear gas "cook" for about 30 minutes before entering and searching the house. The police located Riley two-and-one-half hours later, hiding under a blanket in the attic.

Once in police custody, Riley was treated by paramedics. His clothes were removed because they were contaminated with tear gas, and he was given a paper suit to wear. Riley subsequently was interviewed for two hours. During the interview, he said he was willing to take a polygraph test. He also complained that his wrist hurt.

Agent Leatherman, as part of an interview strategy, lied to Riley and told him that Greenwood had identified him as the man lying on the floor at 3155 Navajo. Leatherman also lied and said that both Fritzke and McCall had identified Riley as the black man seen around Watertown in the blue Beretta. In fact, no identifications had been made. Despite Leatherman's tactics, Riley refused to incriminate himself in the murders. He indicated that he did not know where Watertown was and repeatedly said he had never been to the farm house. He also said he never met a woman named Treesa (Woods). Riley did, however, admit knowing Tholkes and Walters and said he had traded marijuana to Tholkes for crack cocaine when it was "dark" on May 23rd.

Back at the Bobo residence, the police recovered a 9 mm Smith & Wesson semiautomatic handgun.

A month later, on June 28, 1995, a grand jury indicted Riley on three counts of first-

degree murder and three counts of second-degree murder. After a *Rasmussen* hearing, the trial court ruled that the police had probable cause to arrest Riley, that Riley's statement was admissible up to the point at which he invoked his right to remain silent, and that Riley's statement was voluntarily made.

At trial, in addition to the evidence outlined above, the state presented testimony that Greenwood's residue test was inconclusive, but Riley's was positive. The state also presented evidence that Riley's fingerprints were found at the crime scene on a red plastic cup from the kitchen, the stereo cabinet in the living room, and a beer bottle recovered from the yard near the bodies of Tholkes and Walters. BCA forensic scientist David Peterson testified that the prints on the glass of the stereo cabinet might have been left within a "period of days" before they were lifted by the police. Another expert testified that two latent finger prints recovered from the pistol came from Riley and Bobo.

A ballistics expert, Roger Papke, also testified for the state. Papke stated that he had never seen two guns leave identical marks on shell casings. To a "reasonable degree of scientific certainty," he opined, shell casings recovered at the scene were fired from the 9 mm Smith & Wesson pistol that was recovered at the Bobo residence. Papke could not, however, tell whether bullet fragments recovered from the bodies of Tholkes, Woods, and Walters came from the alleged murder weapon.

The court also played for the jury the tape recording of Riley's statement to the police up to the point where Riley invoked his right to remain silent. The court gave the jury a copy of the corresponding transcript for that portion of the interview to use while the tape was played.

■ We now address the legal issues presented on appeal. The first issue we must address is whether probable cause supported the warrantless arrest of Riley. Because this issue affects constitutional rights, this court independently reviews the facts to determine the reasonableness of the conduct of police. *State v. Moorman,* 505 N.W.2d 593, 599 (Minn.1993). The question of the

legality of the arrest turns not on the reasonableness or practicality of obtaining a warrant, but on the reasonableness of the arrest. *State v. Merrill,* 274 N.W.2d 99, 108 (Minn. 1978). To establish probable cause, the police must show that they "reasonably could have believed that a crime has been committed by the person to be arrested." *Id.* (quoting *State v. Sorenson,* 270 Minn. 186, 196, 134 N.W.2d 115, 123 (1965)). Whether the actions of the police were reasonable is an objective, not subjective, inquiry. *Moorman,* 505 N.W.2d 593 at 598. "The existence of probable cause depends on the facts of each individual case." *Id.* at 598–99. When more than one officer is involved in an investigation, Minnesota uses the "collective knowledge" approach to determine whether probable cause existed. *State v. Conaway,* 319 N.W.2d 35, 40 (Minn.1982). Under this approach, the *"entire* knowledge of the police force is pooled and imputed to the arresting officer for the purpose of determining if sufficient probable cause exist[ed] for an arrest." *Id.* (emphasis in original).

■ The necessary first step in the analysis of whether the police had probable cause is to pinpoint the time of Riley's arrest. Minnesota uses the *Mendenhall/Royer* approach to determine whether a seizure has taken place. *State v. Hanson,* 504 N.W.2d 219, 220 & n. 1 (Minn.1993) (citing *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980); *Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)). Using the *Mendenhall/Royer* approach, "the question to be asked by the reviewing court is whether, looking at all of the facts, the conduct of the police would communicate to a reasonable person in the defendant's physical circumstances an attempt by the police to capture or seize or otherwise to significantly intrude on the person's freedom of movement." *Id.*

■ The trial court determined that Riley was under arrest at 7 p.m., Wednesday, May 24, 1995. This was the time when about 40–45 members of the Emergency Response Unit surrounded the Bobo home in which Riley was hiding. The state asserts that the

arrest did not occur until the police actually had custody of Riley's person at 1 a.m., arguing that since Riley was not physically in police custody at 7 p.m., he could not have been under arrest. This is the reasoning outlined in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) which this court has specifically rejected. *In the Matter of the Welfare of E.D.J.*, 502 N.W.2d 779, 781–83 (Minn.1993). We again affirm the *Mendenhall/Royer* standard. Under that standard, it is clear Riley was seized at 7 p.m. Certainly, the surrounding of a house by 45 police officers would communicate to any reasonable person inside the house that the police were restricting that person's movement.

The second step in our analysis is to determine whether police had probable cause to arrest Riley at 7 p.m. The trial court concluded that at 7 p.m., the police did have probable cause for Riley's warrantless arrest. In so doing, however, the trial court relied on one fact that is set forth in the court's conclusions of law that was not yet known to the police at 7 p.m.—that on May 23rd, Fritzke had been asked by a white man and a black man where they could get ammunition. While the transcript at the omnibus hearing is unclear concerning when Fritzke told his story to the police, both parties on appeal agree that Fritzke did not talk to the police until about 10:30 p.m., several hours after the police effected Riley's arrest. Therefore, this court will exclude Fritzke's information from our independent review of the facts.

■ In its conclusions of law, the trial court outlined a number of facts supporting its determination that the police had probable cause to arrest Riley. With the exception of the information provided by Fritzke, those facts are as follows:

(a) James Greenwood, the roommate of one of the victims, had seen a black male at 3155 Navajo Avenue on May 23, 1995 at approximately 8:30 a.m.

(b) James Greenwood identified Troy Tholkes's car in the yard at 3155 Navajo Avenue on May 23, 1995 at approximately 8:30 a.m.

(c) When James Greenwood came home for the night on May 23, 1995, Troy Tholkes's car was gone and Troy Tholkes, James Walters, and Treesa Woods had been killed.

(d) The police found a notebook on the body of Troy Tholkes which had the Defendant's name and pager number listed on the first page.

(e) Sherri Murphy saw the Defendant, Troy Tholkes, and James Walters together in her house at 3:00 a.m. on May 23, 1995.

(f) Sherri Murphy informed the police officers that the Defendant sold crack cocaine to her and Troy Tholkes.

(g) * * * [Fritzke's information].

(h) On the morning of May 24th, the police determined that a Smith & Wesson handgun was missing from the crime scene.

(i) The Defendant telephoned Sherri Murphy at approximately 12:45 p.m. on May 24. When the Defendant answered Sherri Murphy's page, he misrepresented to her his whereabouts, saying he was in St. Paul when in fact he was in south Minneapolis.

While these listed facts were those specifically relied upon by the trial court in making its determination, there are additional facts relevant to a probable cause analysis detailed in the trial court's findings of facts. The trial court found that when Greenwood got up and prepared to leave his home at 3155 Navajo Avenue on Tuesday, May 23, 1995, he assumed Walters had returned home because his door was ajar, the light was on, and Greenwood could smell crack cocaine coming from the room. The court noted that the police found a box for a 9 mm Smith & Wesson, serial number TDB6970, at the murder scene. Additionally, the court found that when the police discovered the entry for Dre in Tholkes' notebook, it was significant because a person named Dre had been seen previously with the victims. Finally, the court recounted Murphy's testimony at the pre-trial hearing and noted that Murphy testified that when she saw Riley, Tholkes, and Walters on the morning of May 23, 1995, she relayed to Walters that his girlfriend, Woods, had called twice, most recently at 1:30 a.m.

Based on these facts, we agree with the trial court that the police had probable cause for the warrantless arrest of Riley at 7 p.m. Because we conclude that the trial court did not err in its probable cause determination, we need not address the issue of whether any "fruits" from the arrest ought to have been suppressed.

■■■ The next issue presented is whether Riley's entire statement to the police should have been suppressed because it was the product of police "trickery and deceit." This issue raises a question of voluntariness. A defendant is deprived of due process of law under the Fourteenth Amendment when the defendant's conviction is founded on an involuntary statement. *State v. Camacho*, 561 N.W.2d 160, 169 (Minn. 1997). The state has the burden of proving that a statement was voluntary by a preponderance of the evidence. *Id.* at 170. "[T]his court will accept the trial court's findings of fact surrounding the giving of the statement unless those findings are clearly erroneous." *State v. Williams*, 535 N.W.2d 277, 286 (Minn.1995). However, this court will examine the entire record and make an independent determination whether a statement was voluntarily given. *Camacho*, 561 N.W.2d at 170.

■■■ The requirement that a statement be voluntary is aimed at deterring improper police conduct during interrogations. *Williams*, 535 N.W.2d at 287. A court must evaluate the totality of the circumstances to determine whether a statement is voluntary. *Id.* The circumstances include: the defendant's age, maturity, intelligence, education, experience, and ability to comprehend; the adequacy or lack of a warning; the length and legality of the detention; the nature of the interrogation; and whether the defendant was denied access to friends and family, or deprived of physical needs. *Camacho*, 561 N.W.2d at 170.

■■■ Coercive police activity is a necessary predicate to a finding that a statement is involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment. *Williams*, 535 N.W.2d at 287. Threats or intimidating techniques, however,

are not required for a court to find that the police exercised improper influence. *State v. Dominguez–Ramirez*, 563 N.W.2d 245, 254 (Minn.1997). The question is whether the defendant's will was overborne. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991).

■■■ Based on the record, the trial court concluded that Riley's statement to the police did not need to be suppressed. Riley argues that the entire statement ought to have been excluded to deter official lawlessness and that an analysis of the facts supports suppression.

First, Riley contends that he was intoxicated at the time of his statement. As proof, he points to his statement and asserts that one of the interrogators knew Riley was intoxicated. The relevant exchange took place long after Riley invoked his right to remain silent:

> Interrogator: Dre, look at me. What have you been smoking lately?
>
> Riley: What have I been smoking?
>
> Interrogator: Yeah, like marijuana? How about crack? You've been touching the crack at all?
>
> Riley: Probably smoking a little Mac or something.
>
> Interrogator: A little Mac here and there. You know, Dre, look at me here. Mac can make you do some stupid things. Dre, I know you're nervous about being down here.

This discussion did not compel a conclusion that either Riley was intoxicated at the time of the interview or that the interrogator knew it. Further, even if Riley had been intoxicated, this fact by itself would not necessarily be proof of involuntariness. *See United States v. Makes Room*, 49 F.3d 410, 415 (8th Cir.1995) (refusing to adopt a per se rule of involuntariness based on accused's intoxication and/or fatigue).

Second, Riley contends the fact that the interrogation lasted two hours in the middle of the night and continued long after Riley invoked his right to remain silent is evidence of coercion. A two-hour interview, in and by itself, is not coercive. Moreover, the police error in continuing to question Riley after he invoked his right to remain silent was recti-

fied by the trial court's suppression of the statement up to the point of invocation—amounting to almost half of the statement.

Third, Riley argues that he was deprived of his physical needs. Riley asserts that despite his complaints about both the noxious effects of the tear gas and injury to his wrist, he was not provided medical care. Further, he contends that he was not allowed to sleep prior to the interview, and he was not given anything to eat. However, a review of the record shows that Riley was not, as he contends, deprived of his physical needs. Although Riley did complain during the interrogation about difficulty breathing because of the tear gas and that his wrist hurt, he had been treated by paramedics and did not ask for any further medical attention during the interview.

Finally, Riley contends that his entire statement ought to have been suppressed because Agent Leatherman lied to him repeatedly during the interrogation. While we are troubled by Agent Leatherman's conduct, we are not persuaded that it made Riley's statement involuntary. *See State v. Thaggard*, 527 N.W.2d 804, 810 (Minn.1995). Our review of the totality of the circumstances supports the trial court's determination that Riley's statement was voluntary. Riley's continued denials demonstrated that his will was not overborne by police tactics. *See Williams*, 535 N.W.2d at 288 (noting that defendant's behavior of standing up to interrogators "evince[d] his ability to withstand pressure"). We therefore hold that the trial court did not err in admitting Riley's statement to the police.

■■■ We now turn to the issue arising from the testimony of a ballistics expert at trial. The "[a]dmission of an expert's opinion testimony generally rests within the sound discretion of the trial court and will not be reversed unless there is clear error." *State v. Koskela*, 536 N.W.2d 625, 629 (Minn.1995). The ultimate question is whether the expert testimony will assist the jury in resolving the factual questions presented. *Id.* (citing Minn. R. Evid. 702). The trial court may consider whether the probative value of the evidence is substantially outweighed by the

danger of unfair prejudice or of misleading the jury. *Id.*

At trial, Papke, the state's ballistics expert testified that he compared shell casings recovered at the scene with casings test-fired from the 9 mm handgun recovered from Bobo's home. Papke testified that he had never seen two guns leave identical marks on casings and that to a "reasonable degree of scientific certainty," casings recovered from the murder scene were fired from the 9 mm Smith & Wesson handgun that was recovered at the Bobo residence.

Riley contends that this testimony amounted to an opinion going to the ultimate conclusion that the Smith & Wesson handgun, the suspected murder weapon, was the source of the shell casings to the exclusion of all other guns. As such, Riley contends the testimony ought not have been admitted under the rule of *State v. Spencer*, which disapproved of the use of "conclusive" testimony from an expert witness. *See* 298 Minn. 456, 461, 216 N.W.2d 131, 134 (1974). Instead, Riley contends that Papke's opinion should have been offered in terms that the test shells were "consistent with" shells found at the murder scene.

■■■ We disagree. Papke did not testify conclusively that the shells could not have come from any other gun except the Smith & Wesson, and therefore, the *Spencer* rule is inapplicable here. *Cf., State v. Bloom*, 516 N.W.2d 159, 168 (Minn.1994) (noting that some courts approve of such conclusive testimony in the fingerprint context). Moreover, it was not error for the trial court to permit Papke to state his opinion to a "reasonable degree of scientific certainty." We have approved of this terminology in the presentation of qualitative testimony such as offered here. *See id.* (expressly sanctioning the use of "reasonable scientific certainty" in the context of DNA evidence). Therefore, it was proper for Papke to state his opinion that to a "reasonable degree of scientific certainty," the Smith & Wesson handgun was the source of the collected shell casings. *See id.*

■■■ The last issue presented is whether the trial court erred when it refused to permit Riley to introduce evidence of his willingness to submit to a polygraph examination.

"Rulings on evidentiary matters rest within the sound discretion of the trial court." *State v. Willis*, 559 N.W.2d 693, 698 (Minn. 1997); Minn. R. Evid. 104(a). "Accordingly, this court will not reverse a trial court's evidentiary ruling absent a clear abuse of discretion." *Id.*

During the interrogation, Leatherman asked Riley whether he was willing to take a polygraph test and he agreed to take one. The state moved to have the portion of Riley's statement concerning the polygraph redacted. The trial court ruled in favor of the state and deleted the references to the polygraph from the portion of the statement heard and read by the jury.

We considered this same issue 35 years ago in *State v. Anderson*, 261 Minn. 431, 437, 113 N.W.2d 4, 8 (1962). In *Anderson*, we noted that polygraph tests had been almost universally held to be inadmissible and concluded: "[i]nasmuch as the results of such tests are inadmissible, it must follow that the refusal or willingness of a defendant to take the test is also inadmissible." *Id.*

The only time we have ever varied from this rule was in *State v. Schaeffer*, where we carved out a narrow exception. 457 N.W.2d 194 (Minn.1990). In *Schaeffer*, defendant's trial counsel elicited evidence that investigators used polygraph test results from the defendant to get him to confess. *Id.* at 195. Defense counsel hoped such evidence would show that the confession was coerced and would persuade the jury to discredit the confession. *Id.* During the trial, the police chief, who conducted the polygraph examination, admitted that he received a confession only after he informed the defendant he had failed the test. *Id.* We held that, based on the specific and peculiar facts presented, the trial court in *Schaeffer* did not err in admitting such evidence, "[n]otwithstanding the general inadmissibility of polygraph evidence" because the defendant was entitled to present evidence to the jury on the circumstances surrounding the making of the confession. *Id.* at 196–97.

 We decline to extend *Schaeffer* to the facts presented here. In this case, Riley was neither given a polygraph test nor did the police use any results to entice him to make a confession. Under *Anderson*, Riley's statement concerning his willingness to take a polygraph test was properly excluded by the trial court.

In conclusion, we hold that the trial court did not err in finding that the police had probable cause to make a warrantless arrest of Riley, the trial court did not err in admitting a portion of Riley's statement, the trial court did not err in permitting the ballistics expert to testify to a "reasonable degree of scientific certainty," and finally, the trial court did not err in excluding Riley's statement that he was willing to undergo a polygraph examination.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.