STATE of Minnesota, Respondent,

v.

Raymond Clyde ROBIDEAU, Appellant.

No. A09–530.

Court of Appeals of Minnesota.

June 15, 2010.

Lori Swanson, Attorney General, St. Paul, MN; and Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, MN, for appellant.

Raymond Clyde Robideau, St. Cloud, MN, pro se appellant.

Considered and decided by STAUBER, Presiding Judge; STONEBURNER, Judge; and ROSS, Judge.

## OPINION

ROSS, Judge.

Raymond Robideau appeals from his conviction of and sentence for second-degree intentional murder for stabbing his

girlfriend to death. Robideau argues that the district court erred by allowing the state to impeach his testimony with an involuntary statement obtained in violation of his *Miranda* rights and by allowing the detective to offer his opinions about witness credibility. Robideau also argues that the district court erroneously departed upward in sentencing him by relying on an improper aggravating factor. Robideau is not entitled to a new trial because we see no trial errors and because the overwhelming evidence of his guilt renders the alleged errors inconsequential. And although the district court based the enhanced sentence on an invalid aggravating factor, we affirm Robideau's sentence because the district court also relied on a valid factor and would have imposed the same sentence absent its reliance on the invalid factor. We affirm.

## FACTS

Raymond Robideau lived in East Bethel with his girlfriend, Sharon Chouinard, and her 13–year–old son, D.C. The couple argued on January 25, 2008, and deemed the relationship over. Chouinard informed her son that they would move to a new home without Robideau. Sometime after 9:00 p.m., one of Chouinard's friends called her and perceived that Chouinard was "very worked up, very upset" about the move and was yelling at Robideau for lying. Robideau sent a text message to his father stating, "Its official we ru [sic] done." Chouinard telephoned another friend around 10:00 p.m. and said that Robideau was being an "asshole" and that they were having a big fight. Her friend overheard Robideau call Chouinard a "bitch" in an agitated voice. Just before midnight, Chouinard talked by telephone with the mother of Robideau's son. She heard Robideau in the background say, "You're lying."

D.C. came home shortly after midnight. Chouinard was in the living room and Robideau was in the bedroom. D.C. began watching a movie with Chouinard, who soon fell asleep. Robideau came out of the bedroom momentarily at around 12:40 a.m. Ten minutes later D.C. went to his basement bedroom. Just before going to bed, D.C. heard his mom say, "Stop it." He heard nothing more.

D.C. woke up at about 11 a.m. but remained downstairs until his grandmother called the house around noon. She was concerned that she had not heard from Chouinard. D.C. knocked on his mother's bedroom door but got no response. D.C. forced open the locked door and found Chouinard's bloody body on the floor. He dialed for emergency help for his mother and told the operator that he thought Robideau "did something to her."

Chouinard had been stabbed twice in the neck and had a deep cut on her right thumb. Blood was on the bed and floor, and traces of blood were in other areas of the house.

Police soon discovered that Robideau had been injured in an explosion at a house in Princeton owned by Robideau's friends J.S. and M.M. J.S. and M.M. had returned to their house just as it exploded and Robideau came running out of a utility room on fire. M.M. threw Robideau to the ground and smothered the fire. Robideau was bleeding from a wide cut across his wrist. Robideau told M.M., "I killed Sharon" and "I want to kill myself." The gas line to the furnace had been disconnected and a lighter lay at the base of the furnace. A bloody knife on the kitchen counter contained both Robideau's and Chouinard's DNA. A bloody paring knife found downstairs contained only Robideau's DNA. A bottle of drain cleaner and an empty bottle of Jack Daniels was in the area of the basement where Robideau sometimes

slept. The liquor bottle had been about three-quarters full before Robideau arrived that day. Robideau was hospitalized and treated for burns and two cuts across his left wrist and one across his right wrist.

Detective Dan Douglas questioned Robideau at the hospital two days later. The detective read Robideau his *Miranda* rights and began the questioning after Robideau indicated that he wanted to talk. The detective ended the questioning after only five minutes. Detective Douglas returned eight hours later. He again read Robideau his *Miranda* rights, but Robideau did not acknowledge that he understood them. The detective declared that Chouinard was dead and that police believed that Robideau had stabbed her. Robideau claimed that he did not know she was dead, denied killing her or trying to kill himself, and stated that he did not know how he ended up in the hospital. Robideau continued to deny involvement for twenty minutes until he eventually requested a lawyer and the detective ended the interview.

The state charged Robideau with first- and second-degree murder and transferred him to the Anoka County jail, where he confessed to two inmates, V.W. and J.B., that he had killed Chouinard. V.W. and J.B. testified at Robideau's trial. According to V.W., Robideau said that he and Chouinard got into a shoving match and he grabbed a knife from the nightstand. Chouinard cut her hand when she tried to grab the knife. Robideau grabbed her, put her on the bed, and stabbed her twice in the neck. He then cut his own wrists to make it appear as if she had cut him. According to J.B., Robideau said that he stabbed Chouinard in the neck while she was sleeping and she cut her thumb when she woke up and tried to grab the knife.

Robideau then cut his wrists in order to be able to later claim self-defense.

The medical examiner testified that Chouinard died between midnight and 6:00 a.m. from the two knife wounds to her neck. She characterized the cut on Chouinard's thumb as a defensive-type wound, but there were no other injuries to her body indicating that a struggle had occurred. The examiner also testified that the cuts on Robideau's wrists were typical suicidal-type wounds and were self-inflicted.

Law enforcement witnesses testified that bloody footprints consistent with the pattern on Robideau's shoes were found in Chouinard's bedroom. Blood found on the kitchen floor, on a liquor bottle in the kitchen, and on Chouinard's purse matched Robideau's DNA profile. The bed sheet was heavily stained with blood, which matched both Robideau's and Chouinard's DNA profiles.

Robideau testified in his own defense and offered the following explanation for Chouinard's death: He and Chouinard had been drinking and got into a heated argument. Chouinard had previously assaulted him after she drank alcohol. Robideau told Chouinard "we're done" and "you're not moving into that house." Robideau went to bed. He felt something hit his arm and looked up and saw Chouinard standing next to the bed. She told him that he was not going to leave her and her son, and she swung her arm. Robideau reached up and got cut. He grabbed her arms, pulled her on top of himself, rolled her over, and pushed her arm into her chest, and they both fell to the floor. Robideau then blacked out because he saw blood. He did not inflict the wounds to Chouinard's neck but assumed it happened when he fell to the floor on top of her.

Robideau's account continued: When he regained consciousness, he saw a knife

sticking out of Chouinard's neck. He went into shock. He smoked a cigarette. He drank some rum. He searched for money. Confused about what to do, he decided to go to Princeton for help. On the way out of the house, he threw the knife into a snow bank next to the front door. At the Princeton house, he attempted to relieve his pain by drinking Jack Daniels, sniffing Drano, and disconnecting the natural gas line and inhaling the gas. Robideau next remembered telling J.S. and M.M. that Chouinard had tried to kill him, and the next thing he remembered, he was waking up in the hospital.

The jury found Robideau not guilty of first-degree murder but guilty of intentional second-degree murder. The state moved for an upward sentencing departure, and Robideau waived his right to a jury determination on the issue of whether aggravating sentencing factors existed. The district court found that aggravating factors justified an upward departure from the sentencing guidelines and sentenced Robideau to 460 months' imprisonment, 93 months beyond his presumptive sentence range. Robideau appeals, requesting a new trial or, alternatively, a reduced sentence.

## ISSUES

I. Did the district court commit reversible error by allowing the state to impeach Robideau with statements he made to a police detective while in the hospital?

II. Was Robideau denied a fair trial when a police detective testified to his opinion that trial witnesses had not colluded with each other and that Robideau was untruthful and merely feigning confusion when he made a statement to the detective?

III. Did the district court rely on invalid aggravating factors when it departed upward and sentenced Robideau 93 months longer than the presumptive sentence range?

## ANALYSIS

### I

Robideau challenges the district court's admission of his second-interview statements at the hospital, which he contends were obtained in violation of his *Miranda* rights and were involuntary. The state concedes that the statements were taken in violation of Robideau's *Miranda* rights but argues that because they were voluntarily made, the state could introduce them to impeach Robideau's testimony. The state is correct.

Even statements obtained in violation of a defendant's constitutional right to counsel may be used to impeach the defendant's credibility as long as the defendant voluntarily provided the statements. *Harris v. New York*, 401 U.S. 222, 224–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971); *State v. Slowinski*, 450 N.W.2d 107, 111 (Minn.1990). The state carries the burden to prove voluntariness by a preponderance of the evidence. *State v. Pilcher*, 472 N.W.2d 327, 333 (Minn.1991). On appeal, we examine the entire record and independently determine whether a defendant's statement was voluntary, but we accept the district court's fact findings relevant to the statement unless the findings are clearly erroneous. *State v. Riley*, 568 N.W.2d 518, 525 (Minn.1997).

Whether a statement was voluntary depends on the totality of the circumstances. We consider the impact of multiple factors, such as the degree of police coercion, manipulation, and pressure that would tend to deprive the defendant of his "ability to make an unconstrained and wholly autonomous decision to speak as he

did." *Pilcher*, 472 N.W.2d at 333. We assess these factors in the context of "the defendant's age, maturity, intelligence, education, experience, and ability to comprehend." *Riley*, 568 N.W.2d at 525. We also consider other relevant factors depending on the circumstances, such as the nature and influence of any warnings, detention, and access to friends, family, or physical needs. *Id.*

■ The state highlights several facts that indicate that Robideau's challenged hospital statements were voluntary. It emphasizes that Detective Douglas first gained assurance from the nurse that Robideau's prior medication would not affect his ability to answer questions, reminded Robideau of his rights under *Miranda*, stood at an unassuming distance from Robideau during questioning, and did not intimidate or threaten Robideau. Robideau does not contest these facts, and he points basically to only one interrogation tactic and one environmental factor to support his claim that his statements were involuntary. These tactical and environmental factors, standing alone or together, fall far short of establishing coerced involuntariness.

■ Regarding coercive interrogation tactics, Robideau asserts only that "[Detective] Douglas took a confrontational tone with appellant—immediately accusing him of murdering Chouinard and calling him a liar when he denied it." This assertion defeats itself. Detective Douglas's alleged high-pressure accusations that Robideau killed Chouinard could not have been the coercive force that led Robideau "to speak as he did"; Robideau spoke *to deny* the accusations, not to admit them. Continued denials in that circumstance defeat a claim that the interviewee's will was overborne by police tactics. *Riley*, 568 N.W.2d at 526; *see also State v. Williams*, 535 N.W.2d 277, 288 (Minn.1995) ("[I]n-

stead of being intimidated during his interrogation, Williams's behavior of standing up to the detectives evinces his ability to withstand pressure."). We agree with Robideau that the recording establishes that during the 20–minute interview the detective persistently accused Robideau of killing Chouinard. But if the pressure to admit guilt under these accusations had actually overborne Robideau's will, he would have buckled with some sort of admission. Instead, he insisted repeatedly, "I didn't hurt Sharon," "I didn't touch a hair on that woman's head," "I didn't kill Sharon," "You need to find out who did this," and other absolute denials of any involvement in or even pre-interview knowledge of Chouinard's death. The detective certainly pressured Robideau to admit guilt, but he did not pressure Robideau to deny guilt, or even to talk to police. Robideau tenaciously withstood whatever actual pressure was applied.

Robideau's claim that he was questioned in a "coercive environment" is similarly unpersuasive to establish involuntariness. Relying on *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), Robideau argues essentially that the detective's questioning "while [Robideau] was medicated and undergoing medical treatment" proves involuntariness. The argument is unconvincing for two reasons. First, *Mincey* does not stand for the proposition that questioning a hospitalized, previously medicated defendant produces involuntary statements per se. Only based on its "careful evaluation of all the circumstances of the interrogation" did the *Mincey* court determine that the defendant's hospital statements were involuntary. *Id.* at 401, 98 S.Ct. at 2418; *cf. Riley*, 568 N.W.2d at 525 ("[E]ven if Riley had been intoxicated, this fact by itself would not necessarily be proof of involuntariness.").

The second reason is that the facts of this case do not resemble the oppressive circumstances present in the involuntary interrogation addressed by *Mincey.* For example, in *Mincey,* the questioned defendant was "lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus" in a "debilitated and helpless condition," but Robideau was lying semi-upright and his breathing tube had been removed permanently; the *Mincey* interrogator "relentlessly" questioned the defendant for four hours, pausing only during short intervals when the defendant lapsed out of consciousness, but Robideau experienced only 20 minutes of questioning while fully awake; some of the *Mincey* defendant's responses were facially incoherent, while Robideau's answers were responsive to the questions; and by many requests to stop the interrogation, the *Mincey* defendant made it clear that he "wanted *not* to answer" the detective's questions, while Robideau's responses made it equally clear that he did.

Robideau contends that, like the *Mincey* defendant, he was confused by medication and therefore unaware of his surroundings. The district court found otherwise, determining that the "medication was not affecting his processing." Robideau challenges that finding. But we accept the district court's findings unless they are clearly erroneous, meaning that they leave us "with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn.1999) (quotation omitted). And the record leaves us with no basis to deem the finding a mistake. The audio recording and transcript of the interview suggest no doubt about the detective's observation that Robideau's "confusion," like his "shock" on "learning" that Chouinard had been murdered, was unconvincing and feigned. We have no basis to second-guess the district court's related finding.

Because Robideau's claimed confusion resulted from theatrics rather than injury or medication, *Mincey* does not advance his argument. The district court accurately determined that Robideau's second-interview statements were voluntary.

 We add that even if those challenged statements were involuntary, we still would not reverse Robideau's conviction and order a new trial. A constitutional error does not require a new trial unless the state fails to show beyond a reasonable doubt that the error was harmless. *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967); *State v. Jones,* 556 N.W.2d 903, 910 (Minn. 1996). The district court's admitting the challenged statements was harmless; we are satisfied beyond a reasonable doubt that even if the alleged error of allowing the statements to impeach Robideau had not occurred, the jury would have reached the same verdict. *See State v. Post,* 512 N.W.2d 99, 102 (Minn.1994).

This is because Robideau's claim of self-defense had no reasonable chance of success with or without the challenged statements that spotlighted Robideau's incredibility. The jury heard overwhelming evidence rendering the defense implausible and establishing that Robideau killed Chouinard intentionally. Robideau had argued angrily with Chouinard. He did not call for emergency assistance after he supposedly "discovered" that Chouinard was stabbed and he did not call authorities or inform D.C. after he "realized" she was dead. He fled the scene telling no one. Robideau blurted out to M.M. that he had killed Chouinard without even suggesting to her that the killing occurred by accident or in self-defense. His explanation for Chouinard's death—that he pulled her onto himself, rolled her over, and pushed her arm into her chest

and that they then fell to the floor—does not account for how Chouinard suffered three knife thrusts in two closely grouped neck wounds. Robideau cut his own wrists intentionally and falsely attributed the injuries to Chouinard's alleged attack. Robideau's rendition does not account for the bloody knives at his friends' house or why police could not find the knife that killed Chouinard that Robideau allegedly threw into a snow bank just outside Chouinard's house. Robideau confessed to three people that he killed Chouinard without telling any of them that he killed her in self-defense. On this evidence, even if Robideau's hospital statements were excluded at trial, no reasonable juror would have believed that Robideau acted in self-defense and acquitted him of intentional second-degree murder.

We hold that the challenged statements were voluntary. And we hold additionally that the decision to allow their admission, even if erroneous, was harmless beyond a reasonable doubt.

## II

 Robideau next argues that the district court denied him a fair trial by allowing Detective Douglas to give his opinion about Robideau's credibility and the credibility of two of the state's witnesses. Trial witnesses may not vouch for or against the credibility of another witness. *State v. Vick*, 632 N.W.2d 676, 689 (Minn.2001). Prosecutors may not elicit credibility-vouching testimony from trial witnesses. *Van Buren v. State*, 556 N.W.2d 548, 550–52 (Minn.1996). The prosecutor also must prepare state witnesses to ensure that they do not give impermissible testimony. *State v. McNeil*, 658 N.W.2d 228, 232 (Minn.App.2003). But a defendant might make certain arguments or introduce material that "opens the door" to allow the state to "respond

with material that would otherwise have been inadmissible." *State v. Bailey*, 732 N.W.2d 612, 622 (Minn.2007) (quotation omitted). The opening-the-door doctrine "is essentially one of fairness and common sense" so that one party does not gain an unfair advantage by introducing misleading or distorted information. *Id.* (quotation omitted).

With this in mind, we turn to Robideau's arguments that Detective Douglas improperly vouched for the inculpatory testimony of Robideau's fellow prison inmates and against Robideau's ostensibly exculpatory hospital statements.

### Opinion Testimony About Inmate Witnesses

Robideau argues that the district court improperly allowed the prosecutor to benefit from misconduct when the prosecutor elicited testimony from Detective Douglas about the credibility of inmates J.B. and V.W. The argument fails.

 Robideau did not object to the challenged questioning and answers. A defendant who fails to object at trial generally waives the right to appellate review of a prosecutor's conduct. *State v. Ives*, 568 N.W.2d 710, 713 (Minn.1997). But appellate courts have the discretion to review unobjected-to prosecutorial misconduct under a modified plain-error test. *State v. Jones*, 772 N.W.2d 496, 506 (Minn.2009). The plain-error test applied to prosecutorial-misconduct claims requires a defendant to show that an error occurred and that the error was plain. *Id.* An error is plain if it was "clear" or "obvious," usually because it violated a law, rule, or standard of conduct. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). If Robideau can demonstrate plain error, then the burden shifts to the state to show that Robideau's substantial rights were not affected or, in other words, that "there is no reasonable likelihood that the absence of the miscon-

duct in question would have had a significant effect on the verdict." *Id.* (quotation omitted). If there is plain error that affected Robideau's substantial rights, we must then determine "whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*

■ In the unique setting here, we are not persuaded that the prosecutor acted inappropriately by asking Detective Douglas for his opinion about the credibility of the witnesses' stories, and, in any event, the detective's response did not vouch for their credibility. Detective Douglas admitted on cross-examination that he had not initially known that J.B. and V.W. were cellmates. On redirect examination, the prosecutor asked the detective if his learning that they had been cellmates affected his opinion about their stories. The detective responded, "Their stories varied somewhat and enough to the degree which I don't believe they colluded or put their stories together."

Allowing the question and answer was not error. Robideau had just put the reasonableness of the detective's investigative reliance on the inmates' statements into doubt by pointing out during the detective's cross-examination that, unbeknownst to the detective, the inmates he relied on in his investigation had actually been cellmates. Robideau attempted to corner the detective for irresponsibly believing two stories that may have been the product of collusion. The prosecutor's questioning on redirect examination allowed the detective to rehabilitate his own credibility; it just happened that in this circumstance the bases for the rehabilitation were the reasons that the officer believed the statements given by two trial witnesses. Additionally, the detective did not actually testify whether he believed or disbelieved J.B. and V.W. or whether he thought their

statements were truthful or untruthful. Recognizing that the prosecutor's questioning was designed to counter the implied assertion that he had errantly relied on unreliable collusive statements, the detective testified that his observations led him to believe that the statements did not arise from collusion.

■ Even if it was plain error to allow the prosecutor to elicit the detective's opinion that the witnesses had not colluded, Robideau's substantial rights were not affected. The admission of evidence that is cumulative or corroborated by other competent evidence is harmless and does not warrant a new trial. *George v. Estate of Baker*, 724 N.W.2d 1, 9 (Minn.2006). Differing details in J.B.'s and V.W.'s stories demonstrated that they had not colluded. The detective's statement that he did not believe that they had colluded was merely cumulative. This circumstance, together with the other overwhelming evidence that contradicts Robideau's self-defense argument, leaves us to conclude that this alleged vouching testimony had no significant effect on the verdict.

### Opinion Testimony About Hospital Interrogation

Similarly, the prosecutor questioned Detective Douglas on redirect examination to allow him to respond to Robideau's implied assertion that medication caused Robideau's false denials. On Robideau's cross-examination of Detective Douglas, Robideau pressed the detective to acknowledge that Robideau claimed to have had "no idea" who the detective was in the hospital. Unless explained, this cross-examination testimony would tend to suggest that Robideau was disoriented when he falsely denied being involved in Chouinard's death or even knowing that Chouinard had died. On redirect examination, the prosecutor

elicited the explanation by asking Detective Douglas whether he believed Robideau's statement, "I have no idea who you are." Douglas answered, "I did not believe him" and explained that he considered Robideau's purported confusion to have been "feigned."

Robideau argues that the district court abused its discretion by admitting this testimony over his objection. Evidentiary rulings are within the district court's discretion, and this court reviews them for an abuse of discretion. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). An appellant must prove that the ruling was erroneous and that it prejudiced the outcome. *Id.* Wrongfully admitted evidence requires reversal only if there is a reasonable probability that it significantly affected the verdict. *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994).

Like the detective's testimony that the inmate witnesses had not colluded, his explanation that Robideau's confusion was feigned was not improper vouching because it was invited by Robideau's cross-examination. Robideau's cross-examination invited the explanation by essentially calling into doubt the detective's reliance on Robideau's hospital statements on the ground that they were merely the product of Robideau's medicated, disoriented mind. On redirect examination, the detective responded to the underlying challenge by declaring *why* the detective had relied on the hospital statements despite Robideau's apparent disorientation. It would have been easier to discern this connection if the prosecutor had built the foundation as to why he was asking the detective's opinion about Robideau's state of mind, but given the district court's latitude in determining evidentiary questions, the connections are clear enough. We hold that the district court did not abuse its discretion by allowing the question and admitting the

evidence that the detective perceived Robideau to have been feigning confusion in the hospital.

### III

Robideau also challenges the length of his sentence. The district court sentenced Robideau to 460 months' imprisonment, 93 months beyond the upper end of the presumptive range, but 20 months less than the statutory maximum sentence under Minnesota Statutes section 609.19, subdivision 1 (2006). The district court concluded that an upward departure was proper because Robideau treated the victim with particular cruelty, and because of the presence of the victim's son in the home during the homicide. Robideau contends that the district court's findings do not support an upward durational departure. The argument fails.

The law presumes that a sentence within the presumptive range is appropriate. Minn. Sent. Guidelines II.D (2006). The district court must impose a sentence within the presumptive range unless "substantial and compelling circumstances" based on aggravating factors warrant an upward departure. *Id.; State v. Jackson*, 749 N.W.2d 353, 360 (Minn.2008). The sentencing guidelines contain a nonexclusive list of aggravating factors that may justify a departure. Minn. Sent. Guidelines II.D.2.b. "Substantial and compelling circumstances" are factual circumstances that significantly distinguish the case, making it atypical. *State v. Peake*, 366 N.W.2d 299, 301 (Minn.1985). The circumstances that underlie the departure are questions of fact for the sentencing jury or, after waiver, for the district court. *State v. Stanke*, 764 N.W.2d 824, 828 (Minn.2009).

We review sentencing departures for an abuse of discretion. *Taylor v.*

*State,* 670 N.W.2d 584, 588 (Minn.2003). The district court abuses its discretion if it relies on an invalid departure ground. *Dillon v. State,* 781 N.W.2d 588, 594–595 (Minn.App.2010). We conduct a de novo assessment of the district court's decision as to whether a valid departure ground exists, relying on the fact findings underlying the decision. *Id.* at 595–596. If we determine as a matter of law that the district court has identified proper grounds justifying a challenged departure, we review its decision *whether* to depart for an abuse of discretion. *Id.* And even if some departure reasons are improper or inadequate, we will affirm the sentence if we conclude that the district court would have departed based on other aggravating factors supported by its findings. *State v. Vance,* 765 N.W.2d 390, 395–96 (Minn. 2009).

We agree that the district court erroneously identified particular cruelty as a proper aggravating factor in this case. But we identify at least one factor—presence of a child—justifying the departure, observe that the district court would have departed upward on that basis alone, and leave the sentence undisturbed.

### Particular Cruelty

 The sentencing guidelines list a defendant's treating the victim with particular cruelty as an aggravating factor. Minn. Sent. Guidelines II.D.2.b.(2). Particular cruelty is cruelty not usually associated with the offense of conviction. *State v. Rourke,* 773 N.W.2d 913, 922 (Minn. 2009). The state has not pointed to conduct that fits this description.

The district court based its particular-cruelty finding on Robideau's allowing Chouinard to lie on the floor and asphyxiate on her own blood and leaving her to be discovered too late to obtain medical assistance. Although failure to obtain medical care for the victim may in some situations

justify a departure based on particularly cruelty, *see State v. Jones,* 328 N.W.2d 736, 738 (Minn.1983) (holding that beating and leaving an elderly man in critical condition without calling an ambulance supported particular cruelty finding to enhance robbery sentence); *Tucker v. State,* 777 N.W.2d 247, 251 (Minn.App.2010) (holding that failure to obtain aid for the victim was particularly cruel in an unintentional murder), *review granted* (Minn. Mar. 30, 2010), we know of no intentional-murder cases justifying a departure on this ground. And conduct that constitutes proof of the criminal offense or that was contemplated by the legislature when setting the punishment for the offense cannot be a circumstance justifying an upward departure. *State v. Edwards,* 774 N.W.2d 596, 602 (Minn.2009).

Failing to facilitate lifesaving aid is a necessary part of engaging in intentionally life-ending conduct. To convict Robideau for intentionally murdering Chouinard, the jury had to find that Robideau caused her death "with intent to effect the death." Minn.Stat. § 609.19, subd. 1(1) (2006). That Robideau sought no aid tends to show only that he intended to effect Chouinard's death. Of course Chouinard's murder was cruel; unexcused and unjustified intentional murder is always cruel. But it was not atypically cruel. Because the intent to kill exists in all convictions of second-degree intentional murder, Robideau's failure to secure aid was not atypical of, or significantly crueler than, the usual conduct associated with that crime.

### Presence of Child

 Robideau argues that the presence of a child in the home was an invalid ground for departure because the state failed to prove that the child saw, heard, or otherwise witnessed the offense. Although the mere possibility of a child's hearing or witnessing an offense is not a

basis to depart upward from the presumptive sentence, a child's actual presence is a proper departure basis if the state proves that "the child[ ] saw, heard, or otherwise witnessed the offense." *Vance,* 765 N.W.2d at 394.

The district court found that D.C. "slept soundly and did not know his mother was murdered" during the attack. Because D.C. did not hear the offense, we must decide whether he "saw . . . or otherwise witnessed the offense" when he discovered his mother's body several hours later.

■ We hold that D.C. "otherwise witnessed the offense." This holding is consistent with the supreme court's express and implicit reasoning for deeming the presence of a child to be an aggravating factor. It has reasoned that "committing the offense in front of the children was a particularly outrageous act and that while the children maybe were not technically victims of the crime, they were victims in another sense . . . [,] particularly since defendant knew . . . that there would be children present who would witness part of what he planned to do." *State v. Profit,* 323 N.W.2d 34, 36 (Minn.1982). Since an aggravating factor exists when the assailant victimizes a day care supervisor knowing that children will observe part of the offense, as in *Profit,* an aggravating factor also arises when the assailant murders and then leaves a victimized mother in a bloody heap under circumstances in which he knows it is highly likely that her child will soon discover the body. It is hard to imagine that a child's trauma is greater when he overhears blows to his mother than when he finds her bloody, lifeless body.

Robideau knew that D.C. was home and that he was highly likely to discover his mother's body soon after the murder. D.C. did discover the body and under these circumstances Robideau essentially committed the offense in the presence of a child; this factor was therefore a valid aggravating factor.

### Other Factors and Sentence

■ When a sentencing departure is based on both proper and improper factors, we need not remand for resentencing if we can determine that the district court would have imposed the same sentence without relying on the improper factors. It is clear to us that the district court would have departed based on the presence-of-a-child finding alone because the sentencing order declares that D.C.'s "presence at the time of the homicide is a sufficient ground for departure standing alone." A single aggravating factor can uphold a sentencing departure. *See, e.g., State v. O'Brien,* 369 N.W.2d 525, 527 (Minn.1985); *State v. Harwell,* 515 N.W.2d 105, 109 (Minn.App.1994), *review denied* (Minn. June 15, 1994). Because we conclude that the district court relied on at least one proper aggravating factor and would have departed on that factor alone, we need not remand to address reliance on the improper factor. We therefore affirm Robideau's enhanced sentence.

### DECISION

Robideau received a fair trial and a proper sentence. The district court did not err by allowing the state to impeach Robideau's self-defense testimony with his hospital statement because the statement was voluntary. The detective's challenged vouching testimony was offered after Robideau's questioning opened the door to the testimony and in any event did not affect Robideau's substantial rights. And the district court's upward durational sentencing departure relied on at least one proper aggravating factor.

**Affirmed.**