**STATE of Minnesota, Respondent,**

v.

**Raymond Clyde ROBIDEAU, Appellant.**

No. A09–530.

Supreme Court of Minnesota.

March 23, 2011.

Rehearing Denied April 28, 2011.

Lori Swanson, Attorney General, St. Paul, MN, Tony Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Raymond Clyde Robideau was found guilty by an Anoka County jury of second-degree intentional murder for the January 26, 2008, stabbing death of Sharon Chouinard. The district court entered judgment of conviction and imposed a sentence of 460 months, which is a 93–month upward durational sentencing departure. The court relied on the aggravating factors of particular cruelty and an offense committed in the presence of a child when it imposed the upward departure. The court of appeals affirmed the conviction and sentence, concluding that the aggravating factor of an offense committed in the presence of a child was a valid ground for the upward departure, but that the district court's reliance on the aggravating factor of particular cruelty was misplaced. We granted review on the sentencing issue. Because we conclude that D.C. (Chouinard's child) did not see, hear, or otherwise witness the commission of Chouinard's murder, we reverse Robideau's 460–month sentence and remand for resentencing consistent with this opinion.

### I.

In October 2007, Robideau lived with his girlfriend, Sharon Chouinard, and her 14–year–old son, D.C., at a house she rented in East Bethel, Minnesota. They found a rental house in St. Francis, Minnesota, and the three of them planned to move on February 1, 2008. But Robideau lost his job as a mechanic and was unable to pay for his share of the deposit for the new house. Robideau did not tell Chouinard about his loss of employment. When Chouinard learned from Robideau's employer that he had lost his job and that he was not a business partner in the company as he had originally told her, she confronted him about the situation and an argument ensued. She decided to end the relationship with Robideau, and told D.C. on January 25 that they would move to the St. Francis house without Robideau.

Robideau stayed with his father on January 23 and 24. On the evening of January 25, Robideau returned to the East Bethel house and planned to spend the night. D.C. was away from the house for

the evening. Chouinard and Robideau had a lengthy argument. Two of Chouinard's friends had telephone conversations with her that evening. One testified that Chouinard was "very upset" with Robideau; the other friend testified that Chouinard and Robideau were having a big fight and overheard Robideau call her a "bitch" in an agitated voice. Robideau sent a text message to his father stating, "Its [sic] official we ru [sic] done."

D.C. returned to the house shortly after midnight and found his mother in the living room listening to music. Chouinard and D.C. watched a movie together, and Chouinard fell asleep on the couch. About 12:40 a.m., Robideau left the master bedroom to go into the kitchen, and on his return to the bedroom asked D.C. what they were watching on television. About ten minutes later, D.C. stood up to go to his basement bedroom. Before going to bed, D.C. told his mother to go to bed, but she indicated that she did not want to go into the master bedroom. Once downstairs, D.C. heard his mother say "stop it." From the sound of her voice, he believed she was still in the living room. D.C. heard nothing more that night.

In the morning, D.C. left his bedroom and went upstairs to answer a phone call from his grandmother, who was concerned she had not heard from Chouinard. D.C. then knocked on his mother's bedroom door, and received no response. Eventually, D.C. forced open the locked door and found Chouinard's bloody body on the floor. He cried "Oh my god, oh my god," and then called 911 and told the operator that he thought Robideau "did something to her." Police were dispatched to Chouinard's house, where they found Chouinard lying on her back on the bedroom floor. She had three stab wounds to her neck and a deep cut on her right thumb. Blood was on the bed and the floor, and traces of blood were found in other areas of the house.

Police investigators discovered that Robideau had been injured in an explosion that afternoon at a house in Princeton, Minnesota, owned by friends of Robideau. His friends stated that they returned home from work around 1:30 p.m., heard an explosion in the house, and then observed Robideau running out of a downstairs utility room on fire. One of the friends threw Robideau to the ground and smothered the fire. Robideau told them "I killed Sharon" and "I want to kill myself." Police investigators discovered the gas line to the furnace had been disconnected and a lighter lay at the base of the furnace. Also, a bloody knife found on the kitchen counter contained DNA from both Robideau and Chouinard.

Robideau was hospitalized for his injuries. Police detectives questioned Robideau at the hospital. During the first interview, Robideau was read his *Miranda* rights and talked with police for about five minutes, and then ended the interview. About eight hours later, the officers again read Robideau his *Miranda* rights, and he spoke with the detectives. During the second interview, he denied any knowledge that Chouinard was dead, and denied killing her or trying to kill himself. Robideau was subsequently charged with second-degree murder and later indicted for first-degree murder. While in the Anoka County jail, Robideau admitted to two inmates that he had killed Chouinard and that he wished he had killed D.C. as well.

At trial, the State presented testimony in support of the charges against Robideau. Robideau testified in his own defense. During his testimony, he stated that he told Chouinard that evening "we're done," that she started a physical fight in the bedroom, and that he was cut during the fight, causing him to black out when he

saw the blood. He denied inflicting the wounds to Chouinard's neck and assumed the injuries occurred when he fell on top of her during his black out.

The jury found Robideau not guilty of first-degree murder and guilty of second-degree intentional murder. The State moved for an upward durational sentencing departure, and Robideau waived his right to a *Blakely* jury trial. The district court sentenced Robideau to 460 months imprisonment, which is a 93–month upward departure from the presumptive sentence. In justifying the upward departure, the district court relied on two aggravating sentencing factors: particular cruelty and an offense committed in the presence of a child.

Robideau appealed to the court of appeals, requesting a new trial or a reduced sentence. *State v. Robideau,* 783 N.W.2d 390, 397 (Minn.App.2010). On appeal, Robideau argued that he did not voluntarily give his statement at the hospital, that various evidentiary rulings deprived him of a fair trial, and that the district court relied on improper aggravating sentencing factors in imposing the upward departure. *Id.* at 395. The court of appeals affirmed Robideau's conviction and sentence. *Id.* Although the court of appeals held that the district court's reliance on the aggravating factor of particular cruelty was misplaced, the court of appeals affirmed the district court's reliance on the aggravating factor of committing an offense in the presence of a child in imposing the upward departure. *Id.* at 403–04. The court of appeals explained that Robideau "essentially committed the offense in the presence of a child" because Robideau knew it was highly likely that D.C. would discover Chouinard's body and D.C. did in fact discover the body. *Id.* at 404. We granted review on the sentencing issue.

## II.

Robideau renews his argument that his 460–month sentence should be reversed because the district court improperly relied on the aggravating factor of committing an offense in the presence of a child. Specifically, he contends that there is no evidence that D.C. witnessed the offense, and therefore there is no basis for the upward departure.

We review a decision by the district court "to depart from the presumptive guidelines sentence for an abuse of discretion." *State v. Edwards,* 774 N.W.2d 596, 601 (Minn.2009) (citing *Taylor v. State,* 670 N.W.2d 584, 588 (Minn.2003)); *State v. Misquadace,* 644 N.W.2d 65, 68 (Minn.2002). We review the reasons given for an upward departure and determine if they are "legally permissible and factually supported in the record." *Edwards,* 774 N.W.2d at 601. The departure will be reversed if the "district court's reasons for departure are 'improper or inadequate.'" *Id.* (quoting *State v. Jackson,* 749 N.W.2d 353, 357 (Minn.2008)). The interpretation of case law is a legal question that is reviewed de novo. *Zurich Am. Ins. Co. v. Bjelland,* 710 N.W.2d 64, 68 (Minn.2006).

The Legislature has the power to fix the limits of punishment for criminal acts. *Misquadace,* 644 N.W.2d at 68. The imposition of a sentence in a particular case within those limits, however, is a judicial function. *Id.* (citing *State v. Olson,* 325 N.W.2d 13, 18 (Minn.1982)). In that regard, the Minnesota Sentencing Guidelines were created to assure uniformity, proportionality, rationality, and predictability in sentencing. *Misquadace,* 644 N.W.2d at 68. The sentencing guidelines provide presumptive sentences based upon the severity of the offense and the offender's criminal history. Minn. Sent. Guidelines I and II; *Taylor,* 670 N.W.2d at 586. In this way, the guidelines are designed to

predictably achieve rational and consistent sentences. *Misquadace,* 644 N.W.2d at 68.

■ But the guidelines allow for different sentences to be imposed when substantial and compelling circumstances warrant different treatment. *See* Minn. Sent. Guidelines II.D; *Misquadace,* 644 N.W.2d at 72. The question presented to the district court when considering a sentencing departure is whether the defendant's conduct in the offense of conviction was " '*significantly* more or less serious than that typically involved in the commission of the crime in question.' " *State v. Jones,* 745 N.W.2d 845, 848 (Minn.2008) (quoting *Misquadace,* 644 N.W.2d at 69). The sentencing guidelines set forth nonexclusive factors for departure. Minn. Sent. Guidelines II.D.2(b); *Jones,* 745 N.W.2d at 848.

We have recognized that the commission of an offense in the presence of a child may be a valid reason to depart from the presumptive sentence. *State v. Profit,* 323 N.W.2d 34 (Minn.1982); *State v. Vance,* 765 N.W.2d 390 (Minn.2009).[1] In *Profit,* we considered, among other things, whether an upward durational departure was justified when criminal sexual conduct was committed at a day care, and children witnessed part of the commission of the crime. 323 N.W.2d at 36. We observed that a durational departure may be warranted when an offense is committed in the presence of a child in two situations: first, when the defendant's conduct is particularly outrageous because the child, while technically not a victim of the offense, is a victim for having witnessed the offense; and second, when the victim is particularly

vulnerable due to the child's presence in the home. *Id.* We affirmed the durational departure in *Profit* because the offense was committed in the presence of children, "particularly since the defendant knew when he went to the center that there would be children present who would witness part of what he planned to do." *Id.*

Subsequently, in *Vance,* we considered, among other things, whether the district court misstated the law in its jury instruction on the presence-of-a-child aggravating factor and, if so, whether the case should be remanded for resentencing. 765 N.W.2d at 394. At issue in *Vance* was whether the offense was committed in the presence of children when the victim kept the children in a separate room from the commission of the crime. *Id.* We reiterated that the presence of a child may be an aggravating factor when the offense is committed in the actual presence of a child, or when the victim is particularly vulnerable due to the child's presence in the home. *Id.* at 393 (citing *Profit,* 323 N.W.2d at 36; *State v. Johnson,* 450 N.W.2d 134, 135 (Minn.1990)). We concluded that the jury instruction materially misstated the law because it focused on whether the children were within sight or sound of the ·offense at issue, and not whether the children actually saw or heard the offense. *Vance,* 765 N.W.2d at 394. We rejected the notion that "the State did not have to prove the children saw or heard the offense, as long as they *could* have." *Id.* Rather, the State must prove that the child "saw, heard, or otherwise witnessed the offense." *Id.*

**1.** In 2009, the Legislature codified a nonexclusive list of aggravating factors that may be used for an upward departure, including when "the offense was committed in the presence of a child." Minn.Stat. § 244.10, subd. 5a(13) (2010). However, the statute does not apply to crimes committed prior to August 1, 2009, and thus is not applicable. Act of May 11, 2009, ch. 59, art. 5, § 8, 2009 Minn. Laws 346, 365–67 (codified at Minn.Stat. § 244.10, subd. 5a (2010)). Effective August 1, 2009, the Minnesota Sentencing Guidelines Commission also revised its nonexclusive list of aggravating factors to include when "[t]he offense was committed in the presence of a child." Minn. Sent. Guidelines II.D.2(b)(13).

Here, the State does not argue that the victim was particularly vulnerable due to the child's presence in the house. Rather, the State argues that the offense was committed in the actual presence of the child. Specifically, the State asks this court to adopt an expansive interpretation of the phrase "otherwise witnessed" that includes a child discovering the aftermath of a murder. Robideau admits that the phrase "otherwise witnessed" is not entirely clear. Nevertheless, Robideau argues that "otherwise witnessed" must mean that the child is somehow cognizant of the crime as it is being committed.

 Nothing in *Vance* suggests that the term "otherwise witnessed" was meant to eliminate the requirement that the child actually witness some portion of the commission of the offense. Accordingly, we conclude that the aggravating factor of an offense committed in the presence of a child is limited to those situations where the child sees, hears, or otherwise witnesses some portion of the commission of the offense in question. The phrase "otherwise witnessed" refers to other sensory perceptions of the child, such as smelling or feeling, by which a child witnesses the commission of a crime.[2] Our conclusion is consistent with the recent amendments to the Minnesota Sentencing Guidelines and Minnesota Statutes that explicitly limit the presence-of-a-child aggravating factor to those situations where "the offense was committed in the presence of a child." *See*

Minn.Stat. § 244.10, subd. 5a(13) (2010); Minn. Sent. Guidelines II.D.2(b)(13).

Here, the record is clear that D.C. did not see, hear, or otherwise witness any portion of the commission of the offense. D.C. testified that he left his mother on the couch in the living room, went downstairs into his bedroom in the basement, and went to sleep. He did not wake up until the following morning and did not discover the body until at least six hours after Chouinard had died. As such, D.C. did not "see, hear, or otherwise witness" the commission of the crime as required for the presence-of-a-child aggravating factor.[3] Because the district court's reason for departure is not factually supported in the record, we reverse Robideau's 460–month sentence and remand for further sentencing proceedings.

Reversed and remanded.

---

**2.** For example, these situations may include a child smelling the victim's burning flesh or feeling the victim's blood on his/her skin during the commission of the crime.

**3.** The State argues for the first time on appeal that when a child discovers the body of a murdered parent, the crime is significantly more serious than the typical murder, and warrants treatment as a new aggravating factor. A defendant who commits a murder in such a way that the child is intended to be the first to discover the body of a murdered parent may warrant treatment as a new aggravating factor. But that issue was not presented to the district court, and thus is not properly before us. Moreover, the district court did not find that Robideau intended for D.C. to discover his mother's body.