**STATE of Minnesota, Respondent,**

v.

**Raymond Clyde ROBIDEAU, Appellant.**

**No. A11–2135.**

Court of Appeals of Minnesota.

June 25, 2012.

---

Lori Swanson, Attorney General, St. Paul, MN, Anthony C. Palumbo, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Steven P. Russett, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by WRIGHT, Presiding Judge; ROSS, Judge; and MUEHLBERG, Judge.

## OPINION

MUEHLBERG, Judge.*

Appellant challenges the district court's imposition of an upward durational departure from the presumptive sentence based on the finding that appellant intended the minor child of his victim to be the first to find his mother's dead body. Appellant argues that this is an impermissible ground for a departure, that there is an insufficient factual basis for this departure, and that he did not receive sufficient notice of this as a departure basis, specifically as it relates to his waiver of a jury trial on an upward departure. We affirm.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

Appellant Raymond Robideau lived with his girlfriend, Sharon Chouinard, and Chouinard's 14 year-old son, D.C., in a rented home in East Bethel. Robideau and Chouinard planned to move to a new rental home on February 1, 2008, but on January 23, Chouinard found out that Robideau lost his job and would be unable to help pay for the new home. The two argued on January 24 and 25, and eventually decided to end their relationship. Chouinard planned to move without Robideau.

On the evening of January 25, Robideau and Chouinard argued for several hours at the East Bethel home. Robideau eventually went into the bedroom alone. D.C. came home at about midnight, and found Chouinard in the living room alone, listening to music. The two began watching a movie. At about 12:40 a.m., Robideau exited the bedroom, walked through the living room and into the kitchen. On the way back to the bedroom, Robideau stopped in the living room to get a cigarette off the table and asked what the two were watching. About ten minutes later, D.C. went to bed, and told Chouinard to do the same. Chouinard indicated that she did not want to, and stayed in the living room. When he was downstairs, D.C. heard Chouinard say "Stop it." D.C. assumed that Robideau was trying to get Chouinard to come to bed, but did not hear anything else that night.

The next day, January 26, at about 11:00 a.m., D.C. woke up, but did not see his mother in the house. He assumed Chouinard had gone out to get packing boxes. At about 11:35 a.m., D.C.'s grandmother, Chouinard's mother, called D.C. and asked him to see if Chouinard was still sleeping. D.C. found that Chouinard's car was still in the driveway, but that Robideau's car was gone. D.C.'s grandmother asked him to wake Chouinard up, and D.C. banged on the locked bedroom door and yelled Chouinard's name. D.C. tried to unlock the bedroom door with a paper clip, but was unable to do so. D.C. then kicked the door from the adjoining bathroom open, and, while still on the phone with his grandmother, found his mother lying on the floor beside her bed. Chouinard was wearing a gray sweatsuit and was partially covered with a comforter. There was a significant amount of blood on the bed and the bedroom floor. D.C. called 911 and then waited outside. It was later determined that Chouinard had three stab wounds in her neck, a deep cut on her right thumb, and bruises on her legs. The medical examiner determined that Chouinard died between midnight and 6:00 a.m. from the stab wounds in her neck.

Sometime between the time that D.C. went to bed and when he awoke, Robideau left the East Bethel home and drove to the home of friends in Princeton. He was later arrested at that home, after apparently attempting suicide and causing an explosion at the home. While in jail after his arrest, Robideau confessed that he killed Chouinard to two different inmates, with whom he was incarcerated while awaiting trial. Notably, he told one of the inmates that he checked on D.C. before leaving the East Bethel house and "started to kill [D.C.]," but decided not to, and drove to the Princeton house instead. At trial, Robideau testified that Chouinard attacked him with a knife, that he grabbed her and fell on top of her, and that he blacked out due to the blood. Robideau testified that he woke up and saw the knife sticking out of Chouinard's neck, but did not call the police or an ambulance. Robideau also testified that he locked the door to the bedroom to keep D.C. from finding the body.

Robideau was charged with first- and second-degree murder. Prior to trial, the prosecution filed a notice of intent to seek an aggravated sentence. This notice listed five possible departure grounds: particular cruelty towards the victim; invasion of the victim's privacy; the presence of the victim's son in the house during the murder; the use of a dangerous weapon in the crime; and particular cruelty towards D.C. "when he locked the bedroom doors behind himself as he left, leaving [D.C.] to find his slain mother." During the jury trial, Robideau signed a waiver of his right to jury trial on the aggravating factors. Robideau was convicted of second-degree murder, but acquitted of first- degree murder. After the verdict, the state sought an upward departure to the statutory maximum of 480 months on two grounds: particular cruelty towards the victim, and the presence of D.C. during the commission of the crime. At the sentencing hearing, the district court stated that "the facts compel me to conclude that [D.C.] and his presence in the house was contemplated by Mr. Robideau as an aftermath of this homicide." The district court found that an upward departure was warranted based on particular cruelty towards the victim and D.C.'s presence in the home during the murder. The district court sentenced Robideau to 460 months in prison, a 93–month departure from the highest presumptive sentence.

Robideau appealed his conviction and sentence to this court. *State v. Robideau,* 783 N.W.2d 390 (Minn.App.2010) (*Robideau I* ). This court affirmed his conviction against challenges to the impeachment use of his statements made in violation of *Miranda* and to certain testimony during the trial. *Id.* at 397–402. This court held that particular cruelty was not a proper aggravating factor in this case, but affirmed the upward departure because D.C. was in the home and therefore "otherwise witnessed" the crime, which constituted proper grounds to depart. *Id.* at 402–04. The Minnesota Supreme Court granted further review on the sentencing issue, and reversed the decision of this court, holding that D.C. did not witness the crime because his physical senses did not perceive the events as they were occurring. *State v. Robideau,* 796 N.W.2d 147, 150–52 (Minn.2011) (*Robideau II* ). In so holding, the supreme court noted that:

> The State argues for the first time on appeal that when a child discovers the body of a murdered parent, the crime is significantly more serious than the typical murder, and warrants treatment as a new aggravating factor. A defendant who commits a murder in such a way that the child is intended to be the first to discover the body of a murdered parent may warrant treatment as a new aggravating factor. But that issue was not presented to the district court, and thus is not properly before us. Moreover, the district court did not find that Robideau intended for D.C. to discover his mother's body.

*Id.* at 152 n. 3. The state petitioned for rehearing on this issue, but the supreme court declined to rehear the case. On remand, the district court heard the state's motion for resentencing, which asked for an upward durational departure because Robideau "committed the murder in such a way that the victim's teenage son was intended to be the first to discover the body of his murdered mother." The district court again sentenced Robideau to 460 months, finding that Robideau intended that D.C. find his mother's body, and that this circumstance made the crime significantly more serious than other second-degree murder cases. Robideau appeals this sentence.

## ISSUES

I.  Is the departure reason given by the district court legally permissible and factually supported?

II.  Was there sufficient notice of this reason for departure?

## ANALYSIS

### I.  Is the departure reason given by the district court legally permissible and factually supported?

A district court must impose the presumptive guidelines sentence unless there are "identifiable, substantial, and compelling circumstances" to warrant an upward departure from the presumptive sentence. Minn. Sent. Guidelines II.D (2008). Before imposing an upward durational departure, the district court must be satisfied that one or more factual circumstances exist to support a departure that is not embodied in the guilty plea, and must explain "why those circumstances create a substantial and compelling reason to impose a sentence outside the presumptive range." State v. Rourke, 773 N.W.2d 913, 919 (Minn.2009). "Substantial and compelling circumstances are those showing that the defendant's conduct was significantly more or less serious than that typically involved in the commission of the offense in question." State v. Edwards, 774 N.W.2d 596, 601 (Minn.2009) (quotation omitted).

"[I]f a district court's reasons for a departure are stated on the record, an appellate court must determine whether the stated reasons justify the departure." State v. Grampre, 766 N.W.2d 347, 351 (Minn.App.2009), review denied (Minn. Aug. 26, 2009). This court must determine whether the reasons provided are legally permissible and factually supported by the record. See Edwards, 774 N.W.2d at 601. Departures cannot be based on elements of the underlying crime, on uncharged or dismissed offenses, on conduct for which the defendant was acquitted, or on conduct for which the defendant was separately convicted. State v. Jones, 745 N.W.2d 845, 849 (Minn.2008).

Whether a particular reason for an upward departure is permissible is a question of law, which is subject to de novo review. Dillon v. State, 781 N.W.2d 588, 595 (Minn.App.2010), review denied (Minn. July 20, 2010). But a district court's decision to depart from the sentencing guidelines based on permissible grounds is reviewed for an abuse of discretion. State v. Reece, 625 N.W.2d 822, 824 (Minn.2001); Dillon, 781 N.W.2d at 595–96. There must be proof beyond a reasonable doubt of any fact that is necessary to support an aggravated sentence. Rourke, 773 N.W.2d at 919. It is an abuse of discretion for the district court to base an upward departure on an improper factor or one not factually supported by the record. State v. Weaver, 796 N.W.2d 561, 567 (Minn.App.2011), review denied (Minn. July 19, 2011).

### A.  Is this a legally permissible basis for a departure?

The first question is whether committing "the murder in such a way that the victim's teenage son was intended to be the first to discover the body of his murdered mother" is a legally permissible basis for a departure. In Robideau II, the Minnesota Supreme Court noted that committing a crime such that "the child is intended to be the first to discover the body of a murdered parent may warrant treatment as a new aggravating factor." 796 N.W.2d at 152 n. 3. Robideau now argues that this is an impermissible aggravating circumstance because it could constitute the offense of child endangerment, with which he was not charged. Robideau further argues that the particular conduct

at issue for the departure was chronologically separate from the murder itself. The state argues that the uncharged-offense argument is unsupported by fact or law, and that the conduct is part of the murder.

■ Robideau's main argument is that his conduct would constitute the charge of child endangerment. Robideau advances the absurd argument that he assumed the role of caretaker for D.C. when he killed Chouinard and endangered D.C. by exposing him to his mother's murder scene. This argument is only feasible if Robideau "assumed responsibility for all or a portion of the care of" D.C. *See* Minn.Stat. § 609.376, subd. 3 (2010). Though the precise requirements of this statute are not before this court, we are not convinced that Robideau could assume responsibility for a child simply by being the sole adult in the home after murdering the child's mother.[1] Because Robideau did not assume responsibility for D.C. in that manner, this conduct is not an uncharged offense and the district court is not precluded from considering this conduct as an aggravating factor.

■ Robideau also argues that "whatever actions he allegedly took to ensure that [D.C.] discovered the body occurred after the murder was complete," and therefore were separate from the murder itself. However, Minnesota courts have found concealment of the body to be aggravating conduct. *See State v. Shiue*, 326 N.W.2d 648, 654–55 (Minn.1982) (considering concealment "as an aggravating factor" when defendant covered the victim's body with branches, twigs, leafy matter, and brush,

making it difficult to find the body); *State v. Murr*, 443 N.W.2d 833, 837 (Minn.App. 1989) (concluding that transportation of victim's body in car trunk, combined with "the manner of concealment of the body that led to its mutilation by coyotes," indicated particular cruelty), *review denied* (Minn. Sept. 27, 1989). The treatment of the body of a murder victim is part of the murder, because a murder inevitably causes a dead body and the murderer's disposition of the body can impact the seriousness of the crime. Thus, Robideau's actions as to Chouinard's body were part of the same factual circumstances as the murder itself. We conclude that committing "the murder in such a way that the victim's teenage son was intended to be the first to discover the body of his murdered mother" is a legally permissible aggravating factor for the purposes of an upward durational departure.

**B. Is this reason for departure supported by a sufficient factual basis?**

The second question is whether this reason for departure is factually supported. Robideau argues that there is insufficient evidence that he intended D.C. to find Chouinard's body, as required by the stated basis for departure. Robideau argues that his testimony that he locked Chouinard's bedroom door to preclude D.C. from finding Chouinard's body shows that the requisite intent did not exist. Robideau argues that the locking of the door could reasonably be interpreted as indicating innocence as to this aggravating factor, and that "circumstantial evidence is insufficient

---

1. Robideau points to *State v. Jones*, 745 N.W.2d 845 (Minn.2008), for the proposition that a defendant could commit child endangerment by failing to prevent harm even when the defendant and the child were together for a short time before the harm befell the minor. This reliance is misplaced because, as an ear-

lier opinion in that case notes, Jones stated that he would care for the minor. *State v. Jones*, No. A04–1303, 2005 WL 2008492, at *6 (Minn.App. Aug. 25, 2005), *direct review denied* (Minn. Nov. 22, 2005) (supreme court later accepted the appeal of the sentencing issue after a decision on remand).

when it is consistent with both a reasonable hypothesis of guilt and innocence." The state argues that the inevitable result was that D.C. would be the person to find the body, that the inevitable result is the intended result, and that Robideau therefore intended that result.

"Intentionally means that the actor either has a purpose to do the thing or cause the result specified or believes that the act performed by the actor, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(3) (2010). Intent "is generally proved circumstantially, based on inferences from the actions and words of the defendant, given the totality of the circumstances." *State v. Super*, 781 N.W.2d 390, 396 (Minn.App.2010), *review denied* (Minn. June 29, 2010). "The defendant's statements as to his intentions are not binding on the jury if defendant's acts demonstrate a contrary intent." *State v. Raymond*, 440 N.W.2d 425, 426 (Minn. 1989).

The district court noted voluminous evidence that indicated that Robideau intended D.C. to find his mother's body. Robideau did not attempt to remove the body or summon help to the scene. Chouinard's car was still parked in the driveway in the morning, so D.C. knew that his mother was still in the house. D.C. was unlikely to leave the house, especially without his mother's permission, because it was January and because he was too young to drive. D.C. knew that his mother would be up and packing the house in the morning. Robideau knew that D.C. was the only other person in the house, and that no one was planning to come to the house to help Chouinard pack for her upcoming move. Thus, Robideau knew that Chouinard's dead body would be in the house in the morning, that D.C. would be alone in the house in the morning, and that D.C. would not be able to leave without consulting his mother for permission. The inevitable result of all of these factors is that D.C. would find his mother's lifeless body.

This is true despite Robideau's ostensible attempt to keep D.C. out of the bedroom. Because D.C. was in the house alone and knew that his mother was in the bedroom, but did not respond, Robideau's attempt to prevent D.C.'s entry into the room could not have been effective. At the time of the murder, D.C. was fourteen years old, and certainly capable of breaking down an interior door. Even Robideau acknowledges that "[t]hese circumstances may be consistent with a rational hypothesis that Robideau knew [D.C.] eventually would look for his mother and possibly be the first to discover her body." Indeed, this is the only rational hypothesis. While the locked door may appear to indicate an intent to prevent D.C. from finding Chouinard's body, the locked door was a wholly ineffective attempt at achieving that result and did little to even delay D.C. finding her body. Because the other circumstances led so inevitably to D.C.'s finding the body, Robideau would have had to do much more than simply lock the door to prevent D.C. from finding Chouinard's body. But he did not do anything more, rather he left the scene in circumstances where it was inevitable that D.C. would find his mother's body. The district court stated that it "searched for but is unable to determine any other logical sequence of events that would allow the undersigned to conclude that somebody other than D[.C.] would be the first to find Sharon Chouinard's body." Considering the totality of the circumstances here, we agree.

Because this was the inevitable result of Robideau's actions, and because a person intends the inevitable consequences of his actions, we agree with the district court that there is a sufficient factual basis for

holding that Robideau intended D.C. to find his mother's dead body.

## II. Was there sufficient notice of this reason for departure?

■ The prosecution is required to notify the defendant of its intent to seek an upward departure. Minn.Stat. § 244.10, subd. 4 (2010); Minn. R.Crim. P. 7.03. Because the construction of procedural rules is reviewed de novo, we review de novo whether the notice in this case fulfills that required in the rules. *Rourke*, 773 N.W.2d at 923.

Robideau argues that this departure basis was not included in the original notice of intent to seek an aggravated sentence. As a result, Robideau argues that it is an impermissible basis for departure and that he did not waive his jury trial right on this issue. *See Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (holding that criminal defendants have a right to a jury trial as to the facts on which a court bases an upward departure); *State v. Shattuck*, 689 N.W.2d 785, 786 (Minn.2004) (applying *Blakely* in Minnesota). The state argues that the notice of intent to seek an aggravated sentence included the basis addressed here as a possible aggravating factor, and that this basis was discussed during trial when the waiver of *Blakely* rights was contemplated by Robideau. This question hinges on whether there is a difference between two statements:

1. "The defendant treated the victim's young son [D.C.] with particular cruelty when he locked the bedroom doors behind himself as he left, leaving [D.C.] to find his slain mother."

2. "The defendant committed the murder in such a way that the victim's teenage son was intended to be the first to discover the body of his murdered mother."

The former is from the original notice of intent to seek an aggravated sentence, the latter is from the motion to seek an aggravated sentence on remand. Robideau distinguishes the two by pointing out that the notice did not directly indicate that the scene-setting was intentional. Robideau is correct that there is no requirement of intentionality in the notice statement, but he would certainly object if he were given an upward departure for an unintentional result. Thus, despite the different phrasings, we cannot discern a meaningful difference between the two. Both relate to leaving the scene of the murder such that D.C. would find his mother's body. As a result, we conclude that the latter statement of this departure basis is a narrower and more precise formulation of the former statement, rather than an expansion or a new basis.

Robideau argues that this basis is precluded by the supreme court's statement that the state was arguing this departure basis "for the first time on appeal." *Robideau II*, 796 N.W.2d at 152 n. 3. But the supreme court immediately followed that statement by noting that this basis "may warrant treatment as a new aggravating factor." *Id.* If, as a matter of law, this basis could not be a ground for departure, the supreme court certainly could have precluded the consideration of this basis on remand. But it did not. We conclude the supreme court's reason for declining to determine whether this basis was legally permissible and factually supported was not intended to preclude that argument altogether.

Robideau argues that the state abandoned this departure basis because the state did not include it in its original sentencing motion. This argument duplicates the question of whether this basis was included in the original notice of intent to seek an aggravated departure. The state's original departure motion included D.C. finding his mother's dead body, but

phrased it in terms of particular cruelty. While phrased differently, we believe that the departure basis we currently address is merely a reformulation of the departure basis in the original departure motion. As such, we conclude that it has not been abandoned.

Finally, Robideau argues that the waiver of his *Blakely* right was not effective as to this departure basis, because it was not included in the original notice. But we have concluded that the notice of intent to seek an aggravated sentence included this basis. Moreover, when the prospect of Robideau waiving his *Blakely* right was raised at the outset of trial, the prosecution again mentioned this reason as a possible ground for a departure. Without any further discussion of the grounds for departure, Robideau validly waived his *Blakely* right. Thus, we conclude that Robideau waived his *Blakely* right to a jury trial on this departure basis.

### DECISION

Intentionally leaving the body of a murder victim to be discovered by the minor child of the victim is a legally permissible basis for an upward durational departure. Because we conclude that it is a legally permissible basis, and because we find that a sufficient factual basis supports the district court's finding that Robideau intentionally left Chouinard's body to be found by her son, we affirm the district court's 93–month departure. Moreover, we conclude that this departure basis was included in the state's notice of intent to seek an aggravated sentence, and affirm the district court's conclusion that Robideau validly and effectively waived his *Blakely* rights as to this departure basis.

**Affirmed.**